UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Jayne Belcher and Jimmy Belcher, | ) |
| | ) |
| Plaintiffs, | ) CIVIL ACTION NO. |
| | ) |
| vs. | ) JUDGE |
| | ) |
| | ) MAGISTRATE JUDGE |
| Sheriff Joseph P. Lopinto, III; Sheriff Newell Normand; Jefferson Parish, CorrectHealth Jefferson, L.L.C., Ironshore Specialty Insurance Co. | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT AND JURY DEMAND**

This is a civil rights action under 42 U.S.C. § 1983 and Louisiana law involving the second of three suicides at the JPCC within a two-month period.  Defendants rightly determined that Joshua Belcher was a suicide risk after he tried to commit suicide.  They put him on suicide watch for three days until they removed him when he said he was no longer suicidal.  One day after removing him from suicide watch, Mr. Belcher committed suicide.  He did so by tying a bed sheet to a window grate in his cell; the same manner of suicide used in a suicide two weeks prior and one month later.  Knowing this window grate made it easier for an inmate to commit suicide in that cell, the Defendants placed Mr. Belcher in the cell and did not fix the window grate until the media reported that three men committed suicide in the same way within a short period of time.

1

## I. JURISDICTION AND VENUE

1. This action is brought through 42 U.S.C. § 1983, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions. In addition, Plaintiff invokes supplemental jurisdiction over claims under state constitutional and statutory law pursuant to 28 U.S.C. §1367.

2. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) since this is the district where a substantial part of the events or omissions giving rise to the claim occurred.

## II. PARTIES

### PLAINTIFFS

3. Plaintiff Jayne Belcher is a person of full age of majority and a resident of Georgia. Plaintiff is the mother of Mr. Belcher (deceased), who was never married, had no children, and suffered and ultimately died as a result of mistreatment endured as a prisoner at JPCC.

4. Plaintiff Jimmy Belcher is a person of full age of majority and a resident of Georgia. Plaintiff is the father of Mr. Belcher (deceased), who was never married, had no children, and suffered and ultimately died as a result of mistreatment endured as a prisoner at JPCC.

### DEFENDANTS

5. At all relevant times, **Defendant Sheriff Joseph P. Lopinto, III** was a person of full age of majority and a resident of Louisiana. Lopinto has been the Sheriff of Jefferson Parish from August 31, 2017 to the present. In the year prior to his appointment, Lopinto was the chief of operations and chief criminal deputy for the Jefferson Parish Sheriff's Office ("JPSO").

6. Lopinto was and is responsible for the hiring, training, supervision, discipline and control of appropriate staff to maintain the care, custody, and control of prisoners in the custody of the

Jefferson Parish Correctional Center ("JPCC" or "Gretna Jail"). He was responsible for all staffing levels of JPCC. He was also responsible for the supervision, administration, policies, practices, customs, and operations of JPCC. Lopinto delegated policy-making authority to Correct Health and its employees for providing medical care at the jail to inmates like Mr. Belcher. Sheriff Lopinto is responsible for the physical maintenance of the jail and the care and custody of inmates in the jail. At all pertinent times, Lopinto was acting under color of law. He is liable both directly for the unconstitutional actions and vicariously for the state law actions complained of herein. He is sued in his in his individual and official capacity.

7.     At all relevant times, **Defendant Newell Normand, III** was a person of full age of majority and a resident of Louisiana. Normand was the Sheriff of Jefferson Parish from October 1, 2007 until August 31, 2017. He was responsible for the hiring, training, supervision, discipline and control of appropriate staff to maintain the care, custody, and control of prisoners in the custody of the Jefferson Parish Correctional Center ("JPCC"). He was responsible for all staffing levels of JPCC. He was also responsible for the supervision, administration, policies, practices, customs, and operations of JPCC. Normand was responsible for the physical maintenance of the jail and the care and custody of inmates in the jail. Normand was a final policy maker who delegated policy-making authority to other Defendants named in this lawsuit, including but not limited to Correct Health. At all pertinent times, Lopinto was acting under color of law.  He is liable both directly for the unconstitutional actions and vicariously for the state law actions complained of herein.  He is sued in his individual and official capacity.

8.     Defendant **Jefferson Parish, Louisiana** is a political subdivision of the State of Louisiana and a municipal corporation. The parish is responsible for providing a good and sufficient jail, La.R.S. 33:4715, and bears the responsibility of financing and physically maintaining the parish

jail. La. R.S. 15:702.  Defendant Jefferson Parish is directly liable for the acts complained herein under Section 1983 due to its policies and practices and its grossly negligent hiring, training and supervision of the defendant CorrectHealth Jefferson and its employees. Defendant Jefferson Parish had knew or should have known about the policies and practices at the JPCC. Defendant Jefferson Parish is also vicariously liable for the acts complained of herein. Declaratory and injunctive relief is also sought as to this Defendant to ensure that Jefferson Parish adopts policies, practices, and procedures to adequately care for pregnant inmates.

9.      At all relevant times, **Defendant CorrectHealth Jefferson, L.L.C.**, ("CorrectHealth") is a Louisiana limited liability company with its principle place of business in this District.  Since 2015, CorrectHealth Jefferson has contracted with Jefferson Parish and JPSO to perform services on its behalf at the Prison, namely providing health care to JPCC inmates. At all material times, CorrectHealth is both a private and public actor.  At all material times CorrectHealth Jefferson, LLC was a final policy maker with respect to placing inmates on, and removing inmates from, suicide watch at the JPCC.  Similarly, CorrectHealth Jefferson, LLC is a final policy maker regarding where to place inmates in the JPCC who are a suicide risk.  CorrectHealth Jefferson, LLC is a final policymaker in terms of having registered nurses provide most of the medical care at the JPCC.  CorrectHealth Jefferson, LLC is charged with properly training its employees on how to care for inmates who are a suicide risk and when to remove an inmate from suicide watch.

10.     At all relevant times, upon information and belief, **Ironshore Specialty Insurance Co.**, is an insurer practicing in this State providing coverage for Defendant CorrectHealth for the misconduct complained herein.

### III.  FACTS

*A.     Joshua Belcher's ten days in the Gretna Jail*

11.     Joshua Belcher was checked into the Gretna jail on August 7, 2017.

12.     On August 13, 2017, Mr. Belcher attempted to commit suicide by hanging himself in his cell by tying a sweatshirt or bed sheet around his neck and affixing it to a door latch in his cell. He was reported to staff and sent to the infirmary.

13.     At the infirmary, Mr. Belcher was placed on suicide watch and, while there, verbally expressed an intent to hurt himself.

14.     Defendants prescribed Ativan to Mr. Belcher and placed him in a restraint chair.

15.     In the early afternoon of August 14, 2017, while still in the infirmary, Mr. Belcher told a social worker that he was "on suicide watch because he was hallucinating while detoxing and wanted the hallucinations to stop."  He also told the social worker he had not slept in seven days.

16.     The social worker reporter Mr. Belcher to be in "acute distress" and "detoxing off heroin, methamphetamine and alcohol."

17.     As of 1:51pm on August 14, Defendants opted to continue Mr. Belcher on suicide watch. At the same time, defendants noted that Mr. Belcher was still a suicide risk because he was detoxing off heroin use.

18.     The next morning, on August 15, Mr. Belcher reportedly told the same social worker, David Jennings, that he "is feelinggood" and that the detox medication is helping. He denied having suicidal ideations or auditory hallucinations. He verbalized having family support, hope for his future, and belief in God. Furthermore, he said he was waiting to be extradited to Florida for 'domestic violence charges' which he believes won't be a problem for him.

19. Noting that he "appeared calm and relaxed," and noting in his records that "[suicidal ideations] resolved", Mr. Jennings opted to remove Plaintiff from suicide watch.

20. The Defendants plan, as per Mr. Jennings, was to follow-up with Mr. Belcher on an 'as request' basis, to follow-up with "the social worker" in a week, and return him to normal housing at the jail.

21. Defendant Lopinto, Normand and Jefferson Parish have a policy of having a psychiatrist present one day per week for only four hours to treat every prisoner on suicide watch and in need of mental health care. The same defndants have a policy of having nurses provide most of the medical care that should be done by doctors in the Gretna jail.

  B.  *Other Suicides at the Gretna Jail*

22. In 2015, Jefferson Parish and the JPSO awarded a contract to Correct Health Jefferson for $8.9 million. In February 2017, they added another year to the contract and another $4.6 million to the job.

23. There were three suicides at the Gretna jail in August and September of 2017; the first one was two weeks before Mr. Belcher's suicide and the third was six weeks after Mr. Belcher hung himself.  Jerome Bell committed suicide on August 4, Josh Belcher on August 17 and Jatory Evans on September 27, 2017.

24. All three suicides were by hanging.  All three involved using a bed sheet affixed to a window grate inside a one-person cell.  At least two of the decedents had told Defendants they were suicidal.  Curiously, all were found by inmates rather than JPSO security personnel.  All three were in cells in an area of the prison that was difficult to monitor due to poor sightlines.

25. On August 4, 2017, Jerome Bell hung himself using a noose made from his bed sheet that was affixed to a window grate inside a one-person cell. The Defendants' investigation described it this way:

> "A window, approximately 1 foot x 3 feet, was on the opposite side of the wall of the cell gate and approximately 6 feet above the bed. An iron grate was welded to the interior of the window and hanging from this grate was [sic] 3 foot long noose. …The noose appeared to have been fashioned from strands of bed sheet material which were braided together."

26. Mr. Bell was placed in a one-person cell despite exhibiting signs that he was a suicide risk.

27. On August 17, 2017, Mr. Belcher hung himself using a sheet affixed to the window grate of his one-person cell. He was found dead by another inmate. According to Defendants' investigation, Mr. Belcher's hanging was identical to Mr. Bell's:

> "A window, approximately 1 foot x 3 feet, was on the opposite side of the wall of the cell gate and set to the right. An iron grating was welded to the interior of the window and tied from this grating was a brown bedsheet with the other end of the sheet torn. The bedsheet was the standard bedsheet issued to inmates."

28. On September 27, 2017, Jatory Evans hung himself with a bed sheet in his one-person cell. Like Mr. Belcher, JPSO personnel were aware that Mr. Evans was suicidal.

29. Subsequent to Mr. Evans' death, Defendant Lopinto ordered a review of all jail policies at they relate to suicide prevention.

30. The Defendants have a policy of not monitoring prisoners on suicide watch who are an obvious suicide risk. Furthermore, Defendants made a choice to place prisoners who are a suicide risk in an area of the prison where it is difficult for Defendants and their employees to see inside the cells. Hence, Defendants have implemented a policy of placing prisoners who are a suicide risk in an area of the prison that makes it difficult to prevent prisoners from committing suicide.

31.     By infrequently walking the tier on suicide watch, Defendants do not regularly monitor cells of prisoners who are a suicide risk. Hence, Defendants have a policy of not adequately monitoring prisoners who are a suicide risk.

32.     Rather than placing prisoners who are a suicide risk on suicide watch in cells with another prisoner, Defendants have a policy of placing prisoners who are a suicide risk on suicide watch in cells alone.

33.     Lopinto spent the year prior to becoming Sheriff as the chief of operations and chief criminal deputy for the JPSO. Upon his appointment as Normand's successor on August 31, 2017, he told the media, "The sheriff's office isn't broken."

34.     In December 2017, Jefferson Parish and the JPSO added an additional $4.7 million to the contract with Correct Health Jefferson. Jefferson Parish did not allow others to compete for this increase. According to the Community Justice Director for Jefferson Parish, Louisiana, Correct Health, "is doing a great job."

     C.     *Defendants were on notice about the suicide risks in the suicide watch cells.*

35.     The Sheriff and Jefferson Parish are liable for installing and not fixing the grates in the cells when the grates were obvious suicide risks/dangers. The Sheriff and Jefferson Parish have a policy of utilizing cells with grates in the window for suicide watch with the knowledge that this is a suicide risk.

36.     The Sheriff and Correct Health have a policy of placing inmates who are suicide risks in cells with grates in the window knowing this situation makes it easier for an inmate to hang himself. Correct Health knew or should have known and prisoners who are a suicide risk are placed in cells that are difficult to monitor and are an obvious suicide risk.

37.     The Sheriff and Correct Health have a policy of releasing inmates from suicide watch without adequate or proper review based on objective criteria that would allow an inmate who has not slept in seven days, suffering withdrawals from heroin, alcohol, and methamphetamine, hallucinating with an actual suicide attempt days earlier, to be released.

38.     The Defendants did not notify the public about the first two suicides; that of Mr. Bell on August 4 and Mr. Belcher on August 17. It only notified the public after Mr. Evan's suicide on September 27 when the press began asking Defendants about this suicide.

39.     On the morning of September 28, for the first time, a story appeared in the newspaper describing all three suicides.

40.     On the afternoon of September 28, the Sheriff decided to conduct an evaluation. The Sheriff initiated the investigation by the fact that "All three cases were nearly identical in modus operandi the inmate used a bedsheet or pieces of the fashioned into a length sufficient to tie around the expanded metal covering the [sic] window and then around the neck.

41.     The Sheriff's Office requested that an internal "evaluation of the current expanded metal be conducted to determine if there any optional products that can be sued in place of the expanded metal. The objective is to limit the ability of an inmate to utilize the windows as a tool to harm themselves."

42.     That evaluation found that:

> "[o]n several of the windows [on the north wing on the fourth floor of the JPCC], the [sic] there is the same expanded metal that was found on the cell windows where the inmates harmed themselves. In other cells there was a smaller hole metal that was welded on top of that. We discussed the possibility of having the smaller hold metal welded in place of the expanded metal currently on the majority of the windows. This would also give us the ability to clean out all of the windows and replace the clouded plastic windows. This process would essentially complete three objectives:  clean out the windows, allow more light into the cells, and limit the ability of the inmates to utilize the windows as a tool to assist in harming themselves."

43. Defendants have exhibited a policy or custom of an inability to properly monitor inmates with known suicidal risks. Defendants have a policy or custom of maintaining a jail with such poor sight lines that it is difficult to monitor inmates on suicide watch.

44. Lopinto and Normand knew the risk of putting prisoners in suicide cells that were difficult to monitor and contained window grating that made it fairly easy to use to commit suicide.

45. Defendants have a Policy of not monitoring prisoners who are a suicide risk. Defendants have a policy of placing prisoners who are a suicide risk in single cells, without a cellmate. Defendants have a policy of putting prisoners who are a suicide risk in an area of the prison with poor sightlines making it difficult for security to monitor. Defendants have a policy of allowing prisoners to help with suicide watch monitoring.

46. Each of these policies was a contributing factor in Mr. Belcher's death.

    D.    *Correct Health's de facto Policy of Failing to Monitor Suicidal Inmates*

47. Recent history reveals that Correct Health has a poor record of prisoners in their care who commit suicide.

48. On September 1, 2016, Chatham County, Georgia, entered into a contract with Correct Health to provide medical care to inmates in its jail in Savannah Georgia. Days later an inmate, Tony Anthony White, died in custody of natural causes.

49. Over the next several months three more inmates - Guy Howard Leonard, Demilo Glover and Jerome Zenus Hill - died of suicide. Mr. Leonard committed suicide in a holding cell by hanging himself *with a telephone cord*. In March 2017, Mr. Glover hanged himself in his cell after just one week of incarceration. Mr. Hill committed suicide under similar circumstances.

50. In February 2017, an entity providing oversight of the jail's medical facilities issued a report indicating that, although CorrectHealth had made strides in prevention observation and the administration of medication, "there are numerous other instances where a lack of clear policy and procedure is increasing the likelihood of an adverse event."

51. The oversight entity concluded that with respect to CorrectHealth, "consistent policies and procedures were lacking when it came to mental health." A full six months after signing the contract, it observed, "By this point in the contract, we would expect that a robust and adequate set of policies and procedures are not only developed, but that staff are fully trained and implementing them."

52. Three days after Glover's death, the sheriff's department made an emergency request to the county manager's office for the purchase of four padded cells at the jail, at a cost of $88,000. The purchase was needed because of an "overwhelming increase of inmates with concerns of physical danger to themselves and/or staff," according to a memo the sheriff wrote to the county manager.

53. The very same month, in March 2017, an oversight entity fined Correct Health $3 million in penalties for various things including derelict suicide prevention.

54. In October 2017, days before its contract with Correct Health was to end, the County Commissioners voted to hire another contractor to provide medical care at its jail. However, after finding another private health care provide to take over the jail, it renewed CorrectHealth's contract when it refused to stay on another month past the original contract's expiration to ensure a smooth transition to another provider.

55. In June 2018, the County Commissioners voted to renew the contract with CorrectHealth at a cost of $7.2 million; an increase over the $6.9 million approved by the county when it first awarded the company the contract in 2016.

56. Around the same time, the jail in Rome, Georgia, according to its County Manager, Jamie McCord, experienced a "spike" in suicides at the jail over an 18-month period in 2015 and 2016 while under the management of Correct Health.

57. "We had the same number of suicides in eighteen months that we had previously in ten years," McCord said in 2017. "We were averaging less than one a year and we had six or seven, I think, in eighteen months."

58. Defendant Correct Health has a policy of not implementing a policy to monitor prisoners who are a suicide risk, or a policy to ascertain who should be removed from suicide watch.

59. Defendant Correct Health has a policy of failing to prevent inmates who exhibit signs of suicide risk from committing suicide.

60. Defendant Correct Health has a policy of deliberate indifference to prisoners on suicide watch.

61. Defendants Lopinto and Normand and Jefferson Parish Louisiana were aware of Correct Health's derelict policies and did nothing to correct them. Despite their knowledge of such Defendants Lopinto and Normand and Jefferson Parish continued their practice of delegating medical and mental health care to Correct Health.

## IV. CAUSES OF ACTION

### COUNT ONE

**42 U.S.C. § 1983 – Violation of Fourteenth
And Eighth Amendment Rights – All Defendants**

62. All previous paragraphs are incorporated herein by reference as if set forth fully here.

63. Defendants Normand, Lopinto, Jefferson Parish, and Correct Health were grossly negligent, reckless, and deliberately indifferent in managing, training, and supervising their subordinates, and medical personnel that interacted with Mr. Belcher.

64. Defendants Normand and Lopinto's failure to supervise (1) Defendant JPCC deputies and medical personnel and (2) Correct Health were a material cause of Plaintiff's injuries.

65. Defendants Lopinto and Jefferson Parish Sherriff's Office's failure to oversee the procedures and conditions at JPCC was a material cause of Plaintiff's injuries.

66. Defendant Jefferson Parish failure to adequately fund the jail was a cause of Mr. Belcher's death.

67. The injuries caused by Defendants' conscious and voluntary acts were serious and resulted in lasting damage. As a result of Defendants' conduct, Plaintiffs suffered, and continue to suffer, physical damage, as well as emotional and mental pain and suffering.

68. Defendants acted under pretense and color of state law in their individual capacities and within the scope of their respective employment. Defendants' actions were beyond the scope of their jurisdiction, authority, and power, and were done willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendment of the United States Constitution.

## COUNT TWO

### Intentional Infliction of Emotional Distress – All Defendants

69. All previous paragraphs are incorporated herein by reference as if set forth fully here.

70. Defendants practices, procedures, and policies were a proximate cause of the intentional infliction of emotional distress.

71. Defendants supervision of the JPCC personnel and Correct Health staff was a proximate cause of the intentional infliction of emotional distress.

72. Defendants actions and inaction were intentional and caused emotional distress to Plaintiffs.

## COUNT THREE

### 42 U.S.C. § 1983 – Violation of Fourteenth Amendment Rights – All Defendants for Failure to Provide Adequate Medical Care

73. All previous paragraphs are incorporated herein by reference as if set forth fully here.

74. Through the conduct described above, Defendants acting under color of state law, unlawfully deprived Plaintiff, of his right to adequate medical care, which is guaranteed by the Fourteenth Amendment of the United States Constitution.

75. Defendants, in failing to enact or enforce policies and procedures to ensure that arrestees received adequate medical care, violated Mr. Belcher's Fourteenth Amendment right to adequate medical care.

76. Defendants failed to enact policies and procedures to ensure that the staff of JPCC would adequately respond to medical emergencies and diagnose and treat arrestees.

77. Defendants failed to enact policies and procedures to ensure the proper release of inmates from suicide watch, including but not limited to:  (a) failing to develop meaningful criteria to

determine whether it was safe to release an inmate from suicide watch; (b) failing to train staff, employees, and/or contractors how to properly diagnose suicide risk; (c) failing to hire qualified, credentialed staff, employees, and/or contractors; and/or (d) allowing unqualified staff, employees, and/or contractors to determine who no longer posed a suicide risk.

78. Defendants were aware or should have been aware of the environment of mismanagement and neglect that existed at JPCC and the consequent risk of injury to arrestees that the environment created.

79. Defendants were aware or should have been aware of the actual injuries sustained by arrestees at JPCC.

80. Despite their actual and constructive knowledge of both the risk present at JPCC and the actual earlier suicide attempt by Mr. Belcher, Defendants exhibited deliberate indifference toward the medical needs of arrestees.

81. Defendants' deliberate indifference and their failure to enact or enforce policies and procedures to ensure that arrestees received adequate medical care, caused and/or exacerbated the injuries.

82. As a result of the constitutionally inadequate medical care at JPCC, Plaintiffs have endured, and will continue to endure, further physical, emotional, and mental pain and suffering.

83. Plaintiffs are not proceeding under the Louisiana Medical Malpractice Act.

## JURY TRIAL DEMAND

84. Plaintiffs demand a jury trial to resolve all claims brought herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that, after due proceedings, judgment be entered in favor of Plaintiffs and against all Defendants, jointly and in solido, and that this Court:

85. Award Plaintiffs all compensatory damages reasonable under the circumstances, including but not limited to, physical pain and suffering, mental anguish and emotional distress, medical expenses, loss of enjoyment of life, and any other compensatory damages, for each count alleged in the Complaint;

86. Award Plaintiffs punitive damages against all Defendants for each applicable count alleged in this Complaint;

87. Award Plaintiffs special damages against all Defendants for each applicable count alleged in this Complaint;

88. Award Plaintiffs' reasonable attorneys' fees, expert fees, and court costs under 42 U.S.C. § 1988 for the prosecution of his 42 U.S.C. § 1983 claims;

89. Award Plaintiffs' reasonable attorneys fees' and court costs under state law for the prosecution of his state law claims;

90. Award Plaintiffs' legal interest on all damages awarded from the date of judicial demand until paid;

91. Award Plaintiffs such other and further relief as this Court deems just and proper; and

92. Award Injunctive and Declaratory Relief against the Defendants' in their official capacities.

Filed: August 3, 2018.

Respectfully submitted,

 /s Soren Gisleson
SOREN E. GISLESON La Bar No. 26302
JOSEPH ("Jed") CAIN La. Bar No. 29785
HERMAN, HERMAN & KATZ
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Tel: (504) 581-4892
Fax: (504) 561-6024
Email: sgisleson@hhklawfirm.com

and

JOHN ADCOCK La Bar No. 30372
P.O. Box 750621
New Orleans, LA 70175
Tel: (504) 233-3125
Fax: (504) 308-1266
Email: jnadcock@gmail.com

Case 2:18-cv-07368-JTM-JCW   Document 1   Filed 08/03/18   Page 17 of 17