UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JAYNE BELCHER ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-7368** |
| **JOSEPH LOPINTO, III ET AL.** | **SECTION: "H"** |

## ORDER AND REASONS

Before the Court is Defendant CorrectHealth Jefferson, LLC's ("CorrectHealth") appeal of the Magistrate Judge's Order and Reasons granting Plaintiffs' Motion to Compel (Doc. 83). For the following reasons, the Magistrate Judge's Order and Reasons is **AFFIRMED**.

## BACKGROUND

This lawsuit, brought under 42 U.S.C. § 1983, involves the suicide of Joshua Belcher at the Jefferson Parish Correctional Center ("JPCC"). Plaintiffs allege that Joshua Belcher's suicide was the second of three suicides at JPCC within a two-month period and that each of these suicides was committed in the same manner.[1] Defendant CorrectHealth is a company that has contracted with Jefferson Parish and its Sheriff's Office to perform medical services and provide healthcare to JPCC inmates. Plaintiffs allege that

---

[1] Specifically, the suicides were committed via hanging by tying bed sheets to window grates in jail cells. *See* Doc. 32 at 1.

CorrectHealth violated Joshua Belcher's Eighth and Fourteenth Amendment rights by being grossly negligent, reckless, and deliberately indifferent in managing, training, and supervising medical personnel that interacted with Joshua Belcher and that CorrectHealth violated Joshua Belcher's Fourteenth Amendment rights by failing to provide adequate medical care.[2]

During discovery, Plaintiffs served CorrectHealth with interrogatories and requests for production of documents. In Interrogatory No. 5, Plaintiffs asked CorrectHealth to "identify any and all suicide attempts within the Jefferson Parish Correctional Center from January 1, 2009 to the present."[3] Plaintiffs allege that CorrectHealth did not answer this interrogatory. In Request for Production No. 3, Plaintiffs asked CorrectHealth to "produce any and all documents relating to Joshua Belcher, including but not limited to, emails, communications, reports, notes, memoranda, psychiatric records, medical records, and infirmary records."[4] Plaintiffs allege that CorrectHealth failed to produce the requested "psychiatric autopsy report," not only for Joshua Belcher, but for the other two suicide victims as well.

Plaintiffs then filed a Motion to Compel against CorrectHealth.[5] The Motion to Compel was referred to Magistrate Judge Wilkinson. The Magistrate Judge granted the Motion to Compel as to Interoggatory No. 5 and Request for Production No. 3.[6] After the Order and Reasons for the Motion to Compel was issued, CorrectHealth timely filed a Rule 72 Objection.[7] Plaintiffs oppose.

---

[2] Doc. 32 at 13–16.
[3] Doc. 45-1 at 4.
[4] *Id*. at 5.
[5] Doc. 45.
[6] Doc. 78 at 2, 4, 8.
[7] *See* FED. R. CIV. P. 72(a) ("A party may serve and file objections to the [Magistrate Judge's] order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.").

2

## **LEGAL STANDARD**

A district judge may refer any non-dispositive pre-trial matter to a United States Magistrate Judge.[8] District judges must consider timely objections to rulings by magistrates on such matters, and they must "modify or set aside any part of the order that is clearly erroneous or contrary to law."[9] "A finding is clearly erroneous only if it is implausible in the light of the record considered as a whole."[10] More specifically, "[a]n order is clearly erroneous if the court 'is left with the definite and firm conviction that a mistake has been committed.'"[11] The "clearly erroneous" standard applies to the factual components of a magistrate judge's ruling, while the legal conclusions are reviewable de novo.[12] Regarding legal conclusions, a ruling is reversible only if the judge "misinterpreted or misapplied applicable law."[13] The district court "may not disturb a magistrate judge's determination on a nondispositive matter merely because it could have been decided differently."[14] Accordingly, this standard is considered "extremely deferential."[15]

---

[8] 28 U.S.C. § 636(b)(1)(A). *See* Castillo v. Frank, 70 F.3d 382, 385 (5th Cir. 1995).
[9] *See* FED. R. CIV. P. 72(a).
[10] Moore v. Ford Motor Co., 755 F.3d 802, 808 n.11 (5th Cir. 2014) (quoting St. Aubin v. Quarterman, 470 F.3d 1096, 1101 (5th Cir. 2006)).
[11] Alphonse v. Arch Bay Holdings, L.L.C., 618 F. App'x 765, 768 (5th Cir. 2015) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)).
[12] *Moore*, 755 F.3d at 806; *see also* Gressett v. City of New Orleans, No. 17-16628, 2018 WL 3642008, at *4 (E.D. La. Aug. 1, 2018); Donahue v. Smith, No. 15-6036, 2017 WL 6604842, at *3 (E.D. La. Dec. 27, 2017).
[13] *See* U.S. Secs. & Exch. Comm'n v. Commonwealth Advisors, Inc., No. 3:12-00700, 2016 WL 1364141, at *6 (M.D. La. Apr. 6, 2016) (quoting Cataldo v. Moses, 361 F. Supp. 2d 420, 424 (D.N.J. 2004)).
[14] *Id.* (quoting Martinez v. Pena, No. 4:03-CV-915-Y, 2006 WL 3289187, at *2 (N.D. Tex. Nov. 1, 2006)).
[15] *Id.* (quoting Am. Realty Trust, Inc. v. Matisse Capital Partners, LLC, No. 3:00-CV-1801-G, 2001 WL 1029466, at *1 (N.D. Tex. Aug. 28, 2001)).

## LAW AND ANALYSIS

### I. Interrogatory No. 5

Plaintiffs propounded the following interrogatory upon CorrectHealth: "Please identify any and all suicide attempts within the Jefferson Parish Correctional Center from January 1, 2019 to the present."[16] Plaintiffs alleged that CorrectHealth failed to answer the request, but at a later discovery conference, CorrectHealth agreed to supplement its discovery response.[17] CorrectHealth produced some spreadsheets but failed to identify which spreadsheet was responsive to Interrogatory No. 5.[18] Plaintiffs then filed a Motion to Compel.

In opposing Plaintiffs' Motion to Compel, CorrectHealth argued that it did respond to the request with the "relevant, requested information from 2016 to 2018."[19] CorrectHealth alleges that at the discovery conference, it informed Plaintiffs that "specifics regarding name, cause of death, and suicide attempts were not in the possession of [CorrectHealth] and were a violation of HIPPA for disclosure."[20] CorrectHealth then agreed to "produce the documentation of monthly statistical reports provided to [Jefferson] Parish by [CorrectHealth] from 2016 to 2018, with redactions of non-relevant specific information."[21] Plaintiffs contend that the spreadsheets that were turned over were "almost completely redacted."[22]

The Magistrate overruled all of CorrectHealth's objections to the Motion to Compel and ordered that a "full and complete response to this interrogatory

---

[16] Doc. 45-1 at 4.
[17] *Id.*
[18] *Id.*
[19] Doc. 52 at 3.
[20] *Id.*
[21] *Id.*
[22] Doc. 72 at 12.

4

must be provided, without equivocating and obfuscating objections."[23] The Magistrate found that CorrectHealth's answer to the interrogatory did not comply with the specificity of description "in sufficient detail" contained in Federal Rule of Civil Procedure 33(d)(1).[24] The Magistrate further ordered that the interrogatory answer be subject to a protective order in light of the fact that a proper answer may include confidential personal medical information.[25]

On appeal, CorrectHealth argues that Plaintiffs' request is overly broad, overly burdensome, and seeks information not proportional to the needs of the case.[26] CorrectHealth notes that it does not keep track of suicide attempts on a statistical or report basis, and in order to produce the requested information, it would have to go chart by chart for a ten-year period. Instead, CorrectHealth asserts that its monthly statistical reports of actual suicides—not suicide attempts—for a three-year period from 2016 to 2018 should suffice.

The monthly statistical reports provided by CorrectHealth in response to the interrogatory are woefully insufficient. First, the charts only identify the monthly statistics for the year 2018; the first twelve pages of the charts fail to indicate a year whatsoever.[27] Second, the charts only identify actual suicides—not suicide attempts.[28] Third, everything else is completely redacted save for

---

[23] Doc. 78 at 2.
[24] *Id*; FED. R. CIV. P. 33(d)(1) ("If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by: (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could . . . .").
[25] Doc. 78 at 2–3.
[26] Doc. 83-1 at 3.
[27] *See* Doc. 52-2.
[28] *Id*.

the categories of events (like "Chronic Care" and "Pharmaceuticals") and data for "Mandown Events" in an unknown year.[29]

Given the allegations that Plaintiffs have lodged against the Defendants in this suit, and against CorrectHealth more specifically, the Court cannot hold that the Magistrate Judge was "clearly erroneous" in ordering the production of data as initially requested by Plaintiffs. Plaintiffs allege that CorrectHealth was deliberately indifferent in the healthcare services it provided to suicidal inmates and that CorrectHealth's "suicide problem is systemic and occurs in all of the infirmaries it runs in all of the prisons."[30] Therefore, data on the amount and frequency of attempted suicides under CorrectHealth's care is relevant to Plaintiffs' causes of action. This data would demonstrate whether and to what extent CorrectHealth was put on notice and if CorrectHealth acted proportionately to any suicide problems that may have been flourishing under its care. Limiting the extent of the discovery response to mere data on the number of successful suicides does not fully appreciate the scope of Plaintiffs' claims. Further, Plaintiffs only requested data for a ten-year period. While CorrectHealth claims that just three years of data would suffice, such a narrowed scope fails to provide the full picture necessary for resolution of Plaintiffs' claims. The degree to which an actor is deliberately indifferent is dependent upon the scope of time being considered. Ten years is a manageable and reasonable period of time for which to collect data. Accordingly, the Court finds that the Magistrate Judge's Order and Reasons as to Interrogatory No. 5 was not clearly erroneous.

## II. Request for Production No. 3

---

[29] *Id.*
[30] Doc. 45-1.

Plaintiffs served the following Request for Production upon CorrectHealth: "Please produce any and all documents relating to Joshua Belcher, including but not limited to, emails, communications, reports, notes, memoranda, psychiatric records, medical records, and infirmary records."[31] Plaintiffs allege that CorrectHealth failed to produce the requested "psychiatric autopsy reports" for Joshua Belcher "and the two other suicide victims that CorrectHealth improperly released from suicide watch – Jerome Bell and Jatory Evans."[32] Citing CorrectHealth's Suicide Prevention Program's Policy and Procedure document, Plaintiffs note that a psychiatric autopsy is a document prepared after a suicide.[33] Specifically, CorrectHealth requires that "[a] psychological autopsy for each suicide . . . be completed within 30 days of the event as a part of the Morality [sic] Review Process."[34] CorrectHealth failed to produce the requested psychiatric autopsy reports, and Plaintiffs filed a Motion to Compel.

In opposing the Motion to Compel, CorrectHealth argued that the report is protected by the work-product doctrine, attorney-client privilege, and peer-review privilege.[35] CorrectHealth also raised objections as to relevancy and proportionality.[36] Magistrate Judge Wilkinson overruled each of CorrectHealth's objections and ordered that the psychiatric autopsies for Joshua Belcher, Jerome Bell, and Jatory Evans be produced, subject to a protective order.[37]

---

[31] *Id.* at 5.
[32] *Id.* at 6.
[33] *See* Doc. 45-5.
[34] *Id.* at 5.
[35] *See* Doc. 52 at 4–5; *see also* Doc. 77 at 3–9. The Court notes that while CorrectHealth did not expressly raise the work-product doctrine as an objection, its briefing implicated the doctrine's protections. Additionally, CorrectHealth refers to the peer-review privilege as the self-critical analysis privilege.
[36] Doc. 77 at 7.
[37] Doc. 78 at 8.

On appeal, CorrectHealth re-urges its initial objections to the Request for Production No. 3. CorrectHealth also argues that the Magistrate's Order and Reasons was clearly erroneous in ordering production of the psychiatric autopsies for Jerome Bell and Jatory Evans in addition to Joshua Belcher's. The Court will review each objection in turn.

### A. Production of Psychiatric Autopsies for Jerome Bell and Jatory Evans

CorrectHealth first argues that the Magistrate erred in ordering the production of psychiatric autopsies for Jerome Bell and Jatory Evans by expanding Plaintiffs' discovery request. CorrectHealth correctly notes that Plaintiffs' Request for Production No. 3 only requested production of documents "relating to Joshua Belcher." However, in their Motion to Compel, Plaintiffs expressly stated that "CorrectHealth failed to produce 'Psychiatric Autopsy' reports for Belcher and the two other suicide victims."[38] At no point in CorrectHealth's reply or sur-reply did it argue that the request as described by Plaintiff was erroneous or outside of the scope of the initial request. Relying on Plaintiffs' express language in the Motion to Compel and the absence of any opposition by CorrectHealth as to the request including reports for the other two suicide victims, the Magistrate noted that "[P]laintiffs' motion limits [Request for Production No. 3] to production of 'psychiatric autopsy' reports for three inmates who committed suicide in the jail: Joshua Belcher, Jerome Bell and Jatory Evans."[39]

Now, on appeal, and for the first time, CorrectHealth asserts an objection to the scope of the Request for Production. CorrectHealth asserts that the Magistrate's Order is clearly erroneous because it grants the Request for

---

[38] Doc. 45-1 at 6.
[39] Doc. 78 at 4.

8

Production as described in Plaintiffs' Motion to Compel but not as described in the initial Request for Production.

The Court does not find that the Magistrate's Order was clearly erroneous on this front. Plaintiffs' Motion to Compel expressly delineated the scope of the request to Joshua Belcher and two other suicide victims. CorrectHealth never argued for a narrower scope and never asserted that there was an impermissible expansion of the initial request. And now, on appeal, CorrectHealth fails to provide any authority for its conclusive, three-sentence argument that the Magistrate's Order is clearly erroneous. "Accordingly, the Court will not consider Defendant's contention[s] . . . . that 'could have been, but inexplicably [were] not, presented to the magistrate in the first instance.'"[40] Based on what was before the Magistrate at the time the Order was issued, the Court cannot say that it was clearly erroneous for the Magistrate to order the production of psychiatric autopsies for Jerome Bell and Jatory Evans.

### B. Work-Product Doctrine & Attorney-Client Privilege

In opposing Plaintiffs' Motion to Compel the production of autopsy reports, CorrectHealth asserted the attorney-client privilege and implicated the work-product doctrine. CorrectHealth argued that the psychiatric autopsy was "ordered to be done by CorrectHealth's Chief Legal Counsel" and "prepared at the request of legal counsel for legal purposes."[41] CorrectHealth thus concluded that "the document is protected from disclosure under the attorney-client privilege."[42] The Magistrate disagreed.

---

[40] Blessey Marine Servs., Inc. v. Jeffboat, LLC, No. 10-1863, 2011 WL 13202952, at *3 (E.D. La. June 24, 2011) (quoting Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987)).
[41] Doc. 52 at 4.
[42] *Id.*; *see also* Doc. 77 at 4.

Looking to the deposition testimony cited by CorrectHealth, the Magistrate noted that a "statement by a non-witness attorney [for CorrectHealth] at a deposition that a document was prepared for legal reasons is not evidence sufficient to establish work product or attorney-client privilege."[43] The Magistrate then looked at other deposition testimony, which established that a psychiatric autopsy is created after every suicide at JPCC, "regardless whether a lawsuit is filed, whether there is a threat of litigation or whether there is any attorney involvement following a particular suicide incident."[44] The Magistrate also considered CorrectHealth's written suicide prevention policy and procedure, which establishes that psychiatric autopsies "are completed within 30 days of every suicide at JPCC in the ordinary course of business activities as part of CorrectHealth's 'mortality and morbidity' review process."[45] Other deposition testimony further established that, as a matter of policy, every suicide attempt at JPCC is reviewed by CorrectHealth's Chief Legal Counsel; that a mortality and morbidity review meeting is held after every suicide incident at JPCC regardless of whether a lawsuit has been filed; and that all CorrectHealth employees from its facilities in Louisiana and Georgia are invited to attend and participate at the mortality and morbidity review meetings.[46]

Based on that evidence, the Magistrate found that "the psychological autopsy reports are generated in the ordinary course of CorrectHealth's business activities following suicides at JPCC, pursuant to a uniform written

---

[43] Doc. 78 at 5. *See also* Doc. 52-6 at 7–8 (transcript of deposition of David Jennings, author of Joshua Belcher's autopsy report, where counsel for CorrectHealth objects to Plaintiffs' counsel's question about the autopsy and asserts the report was "prepared at the request of legal counsel for legal purposes.").
[44] Doc. 78 at 5–6.
[45] *Id.* at 6.
[46] *Id.*

10

policy and are reviewed by CorrectHealth's legal counsel and staff for quality assurance purposes."[47] The Magistrate also noted that "the mere fact that these reports were reviewed by CorrectHealth's legal counsel and are relevant to the present litigation is insufficient to protect them from discovery on attorney-client privilege or work product grounds."[48]

On appeal, CorrectHealth argues that the Magistrate overlooked testimony by the author of Joshua Belcher's psychiatric autopsy, wherein he stated that legal counsel for CorrectHealth instructed his supervisor to have him author the report. However, this testimony does not negate the fact that these autopsy reports are created as a matter of routine policy; they are made regardless of a lawsuit being filed—and Joshua Belcher's psychiatric autopsy would have been made regardless of any impending lawsuit, pursuant to CorrectHealth's own policies and procedures.

Work product protection from discovery extends to "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative."[49] The work product "privilege can apply where litigation is not imminent, as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."[50] "[T]he attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice."[51] Here, the psychiatric autopsies are created as a matter of course, irrespective of anticipated litigation or of any need for legal advice—and they certainly are

---

[47] *Id.* at 6–7.
[48] *Id.* at 7.
[49] FED. R. CIV. P. 26(b)(3)(A).
[50] Udoewa v. Plus4 Credit Union, 457 F. App'x 391, 393 (5th Cir. 2012) (quoting In re Kaiser Alum. & Chem. Co., 214 F.3d 586, 593 (5th Cir. 2000) (internal quotation omitted)).
[51] King v. Univ. Healthcare Sys., L.C., 645 F.3d 713, 720–21 (5th Cir. 2011) (quotations and citations omitted).

11

not confidentially shared just between a client and his lawyer. The Court finds that the Magistrate did not err in holding that the attorney-client privilege and work product doctrines do not prohibit the production of the requested psychiatric autopsy reports.

### C. Peer-Review Privilege

CorrectHealth's final objection to Plaintiffs' Motion to Compel the psychiatric autopsies raises Louisiana's peer-review privilege statutes.[52] CorrectHealth asserts that the psychiatric autopsies contain "self-critical analysis submitted for peer review, policy making, and remedial action," and are therefore "the exact type of information protected from disclosure" under Louisiana's peer-review privilege statute.[53] Plaintiffs countered with arguments that federal law, as opposed to state law, applies to claims of privilege in this suit; that federal courts do not protect peer review materials in civil rights actions; and that federal courts do not recognize the peer-review privilege in jail or prison cases.

The magistrate overruled CorrectHealth's peer-review privilege objection. First, the Magistrate noted that "this is a federal question case brought under Section 1983 with a single pendent state law claim."[54] Then, citing several Louisiana district court cases, the Magistrate noted that in cases where purportedly privileged information relates to the federal law claim—such as this one—the "federal law of privilege governs all claims of privilege asserted in the litigation."[55] The Magistrate then noted that there is no peer-

---

[52] *See* Doc. 52 at 4 (citing LA. STAT. ANN. §§ 44:7, 13:3715.3).
[53] Doc. 52 at 4.
[54] Doc. 78 at 7.
[55] *Id*. (citing Rdzanek v. Hosp. Serv. Dist. No. 3, No. 03-2585, 2003 WL 22466232 (E.D. La. Oct. 29, 2003) ("Courts turn to federal law regarding privileges in federal question cases, but look to state law privileges when state law provides the rule of decision for the plaintiff's claims . . . . Courts addressing the issue have held that when the allegedly privileged information relates to the federal law claim, federal law of privilege governs all

12

review privilege under federal common law or federal statutory law, and that as a result, the Louisiana peer-review privilege statute does not apply in the case.[56]

On appeal, CorrectHealth argues that the Magistrate should have applied three factors from *Jaffee v. Redmond* to determine whether a "peer review privilege exists."[57] *Jaffe* is a United States Supreme Court case which formally recognized a new type of privilege—the psychotherapist privilege—under Federal Rule of Evidence 501.[58] CorrectHealth therefore appears to argue that it was clearly erroneous for the Magistrate to refrain from engaging in this three-factor test.[59] The Court disagrees. The three-factor test cited by CorrectHealth is used to determine if a federal court can properly define new federal privileges under Federal Rule of Evidence 501 if one does not already exist.[60]

Magistrate Judge Wilkinson correctly established that the federal law on privileges, not state law, applies in this case. CorrectHealth has failed to demonstrate the existence of a peer-review privilege at the federal common

---

claims of privilege raised in the litigation."); Vezina v. United States, No. 2:07 CV 0904, 2008 WL 11395516 (W.D. La. June 3, 2008); Robertson v. Neuromedical Ctr., 169 F.R.D 80 (M.D. La. 1996) (declining to recognize a peer-review privilege in case with federal law and state law claims because "[t]his is not a case where the substantive law is only nominally federal because it incorporates state law by reference. There has been no showing by the hospitals that state law issues predominate over federal issues.")).

[56] *Id.* at 7–8 (citing *Rdzanek*, 2003 WL 22466232, at *3).

[57] *See* Doc. 83-1 at 6 (citing Jaffe v. Redmond, 518 U.S. 1 (1996)).

[58] *Jaffe*, 518 U.S. at 15 (holding that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence.").

[59] Doc. 83-1 at 6–7 ("The Order is erroneous in finding that the self-critical/peer review privilege does not apply in this context. . . .").

[60] *Jaffe*, 518 U.S. at 8 ("Rule 501 of the Federal Rules of Evidence authorizes federal courts to define new privileges by interpreting 'common law principles . . . in the light of reason and experience."); *see also Rdzanek*, 2003 WL 22466232, at * 3 ("If the court determines that privilege does not exist under federal common law, then a secondary question is presented, namely, should the court recognize the privilege.").

law. In the absence of a recognized peer-review privilege in the federal common law, this Court declines CorrectHealth's invitation to adopt it as a new one. As such, the Magistrate was not clearly erroneous in finding that the peer-review privilege is inapplicable in this case.

## **CONCLUSION**

For the foregoing reasons, the Magistrate Judge's Order and Reasons is **AFFIRMED**.

New Orleans, Louisiana this 8th day of November, 2019.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**