## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JAYNE BELCHER ET AL.**                    **CIVIL ACTION**

**VERSUS**                                         **NO. 18-7368**

**JOSEPH LOPINTO, III ET AL.**              **SECTION: "H"**

## ORDER AND REASONS

Before the Court are Defendant Jefferson Parish's Motion for Summary Judgment (Doc. 110); Defendants CorrectHealth Jefferson, L.L.C. and Ironshore Specialty Insurance Co.'s Motion for Summary Judgment (Doc. 131); and Defendants Joseph Lopinto and Newell Normand's Motion for Summary Judgment (Doc. 132). On September 9, 2020, this Court issued an Order granting Jefferson Parish's Motion for Summary Judgment, denying CorrectHealth Jefferson, L.L.C and Ironshore Specialty Insurance Co.'s Motion for Summary Judgment, and granting Joseph Lopinto and Newell Normand's Motion for Summary Judgment; these reasons follow.

## BACKGROUND

This action arises out of Joshua Belcher's suicide at the Jefferson Parish Correctional Center ("JPCC") in Gretna, Louisiana, where he was being held as a pretrial detainee. The circumstances of Belcher's death are as follows:

On August 7, 2017, Jefferson Parish officers found Joshua Belcher in his vehicle, unconscious from apparent drug use. Upon learning that there was an

1

outstanding warrant for Belcher's arrest in Florida, the officers transported Belcher to JPCC. In Belcher's first few days at JPCC, he exhibited multiple symptoms of withdrawal, and was given prescription medication to assist with his detox.[1]  On August 12, 2017, Belcher told JPCC staff that other inmates in his pod had become "enemies" and that he feared for his life. Accordingly, JPCC staff scheduled Belcher's transfer to a different pod and moved Belcher to a Southwing "holding cell." On August 13, 2017, while in the Southwing, Belcher attempted suicide by "tying a bed sheet around his neck and hanging from the holding tank door handle."[2]  When staff came to Belcher's aid, Belcher became "violent and erratic," and "he was placed in [a] restraint chair for his safety and the safety of others."[3] Belcher was subsequently moved to the infirmary and placed on suicide watch.

David Jennings, a social worker for CorrectHealth Jefferson L.L.C. ("CH"), was in charge of monitoring Belcher's mental health while Belcher was on suicide watch.  Jennings conducted two, ten to twenty-minute, interviews of Belcher while he was in the infirmary. In the second interview, on August 15, 2017, Jennings found that Belcher's mental health had improved and believed Belcher's withdrawal symptoms to have abated. Shortly thereafter, without conducting any psychological or diagnostic assessment, Jennings discharged Belcher from suicide watch, authorized his release to general population, and ordered that a follow-up evaluation be scheduled for one week later.

---

[1] The physician's assistant who first examined Belcher at JPCC noted: "32 yo male is presenting with a history of heroin and alcohol abuse. He reports using 1-2 grams of heroin along with consuming a fifth of liquor per day . . . High ETOH Detox Protocol." Doc. 139-7 at 2 (internal quotations omitted).
[2] Doc. 132-3 at 2.
[3] Doc. 131-4 at 36.

Belcher was moved from the infirmary into a cell in the "Administrative Segregation pod" in the North Wing of the prison. In the Administrative Segregation pod, cells accommodate one or two inmates and the inmates remain in their cells for 23 hours per day. Belcher was the only inmate assigned to his cell. On August 17, 2020, two days after his release from suicide watch, Belcher was found dead in his cell as a result of a suicide by hanging, effected by tying his bedsheet around the metal grating bars in his cell's window.

There were two other suicides that took place at JPCC in a nearly identical manner right before and after Joshua Belcher's suicide. On August 4, 2017, Jerome Bell was found dead in his cell from suicide. On September 27, 2017, Jatory Evans was found dead in his cell from suicide. Both suicides were completed in the same way as Joshua Belcher's: using bedsheets as nooses, tied around the metal bars of cell windows. Like Belcher, both Jerome Bell and Jatory Evans were discharged from suicide watch by the same CH employee prior to committing suicide.

On August 3, 2018, Belcher's parents, Jayne and Jimmy Belcher ("Plaintiffs"), filed this suit, alleging violations of Section 1983 and state law against Joseph P. Lopinto, III (in his individual capacity and in his official capacity as the current Sheriff of Jefferson Parish); Newell Normand (in his individual capacity and in his official capacity as the former Sheriff of Jefferson Parish at the time of Joshua Belcher's detention); Jefferson Parish ("the Parish"); CH, the contracted healthcare provider for the JPCC; and Ironshore Specialty Insurance Co. ("Ironshore"), the insurance provider for CH.

Plaintiffs bring five claims against Defendants in their First Amended Complaint. Count I is a claim under 42 U.S.C. § 1983 against Lopinto, Normand, and CH for violations of Joshua Belcher's Fourteenth and Eighth

Amendment rights under a failure to train/supervise theory.[4] Count II is a state law claim against Lopinto, Normand, and CH for intentional infliction of emotional distress.[5] Count III is a claim under § 1983 against Lopinto, Normand, and CH for violations of Joshua Belcher's Fourteenth Amendment right to adequate medical care.[6] Counts IV and V are claims addressing only Defendant Jefferson Parish. Count IV is a claim under § 1983 for violations of Joshua Belcher's Fourteenth and Eighth Amendment Rights "and for failure to provide Adequate Medical Care and [sic] Violation."[7] Count V is a state law claim for gross negligence and intentional misconduct.[8]

Plaintiffs and Defendants agree that: (1) the Sheriff and the Jefferson Parish Sheriff's Office ("JPSO") are responsible for the safety and security of the inmates at the JPCC; (2) Jefferson Parish is responsible for maintaining the brick-and-mortar JPCC building; (3) Jefferson Parish is responsible for ensuring a contract is in effect to provide for healthcare services at JPCC; and (4) Jefferson Parish contracted with CH to provide the healthcare services at JPCC.

In the instant Motions, Defendant Jefferson Parish seeks dismissal with prejudice of all claims against it; Defendants CH and Ironshore seek dismissal with prejudice of Plaintiffs' § 1983 deliberate indifference claims against them;

---

[4] Doc. 32 at 13.

[5] *Id.* at 14.

[6] *Id.* at 14–15.

[7] *Id.* at 16. The bracketed text "[sic]" is original to the First Amended Complaint.

[8] *Id.* at 20. Presumably, this claim is brought under Louisiana Revised Statutes § 15:703, which provides:

> The parish and its governing authority shall not be liable for any action arising as a result of the actions or inactions of the physician or health care provider [for the parish jail] . . . unless the governing authority exercises gross negligence or willful misconduct in the performance of its duties and obligation imposed by this Section, and such gross negligence or willful misconduct was a substantial factor in causing the injury.

and Defendants Lopinto and Normand seek dismissal with prejudice of all § 1983 claims against them in both their individual and official capacities. Plaintiffs oppose. This Court will take each Motion in turn.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[10] Nevertheless, a dispute about a material fact is "genuine" such that summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[11]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[12] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[13] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[14]

"In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the

---

[9] FED. R. CIV. P. 56.
[10] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[11] Id.
[12] Coleman v. Hous. Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997).
[13] Engstrom v. First Nat'l Bank, 47 F.3d 1459, 1462 (5th Cir. 1995).
[14] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial."[15] The Court does "not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[16] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[17]

## LAW AND ANALYSIS

Before engaging with the substance of the Motions, an overview of the law governing Plaintiffs' claims and Defendants' Motions is necessary.

The delineation of the various defendants' responsibilities with respect to the JPCC is critical to any analysis and is set out here. First, Jefferson Parish has two sole responsibilities: (1) to perform physical maintenance of all parish jails and prisons[18] and (2) to appoint a physician to attend to the prisoners confined in parish jails or enter into a contract with a healthcare provider to do so.[19] In a case where the Parish has opted to contract with a healthcare provider company, the Parish will have an additional responsibility of abiding by its obligations under the healthcare services contract.[20] Second, CH (as the company contracted by Jefferson Parish to provide medical care to the Parish's inmates) has a duty to: (1) provide constitutionally adequate

---

[15] Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

[16] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 393–94 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).

[17] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

[18] LA. REV. STAT. § 15:702.

[19] Id. § 15:703.

[20] Id. § 15:703(D) (noting that as it relates to a parish's authority to contract with a healthcare provider, "[t]he sole responsibility [of the parish] shall be . . . its contractual obligations with [the] health care provider").

medical care[21] and (2) fulfill its obligations under the contract with the Parish. Third, Defendants Lopinto and Normand, as current and former Sheriffs of Jefferson Parish, are the "keeper[s] of the public jail."[22] Louisiana law designates each parish's Sheriff's Office as the managing authority for the functioning of parish jails.[23] As such, they are responsible for the safety and wellbeing of the people that they detain.[24]

Also relevant to each Defendant's Motion is the law governing civil rights claims by pretrial detainees. Pretrial detainees and convicted prisoners look to different constitutional provisions for their respective rights to basic needs like medical care and safety.[25] Whereas the rights of a convicted state prisoner flow from the Eighth Amendment's prohibition on cruel and unusual punishment, the rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment.[26] Unlike convicted prisoners, states cannot punish pretrial detainees.[27] Thus, a pretrial detainee's due process rights are said to be "at least as great as the Eighth Amendment protections available to a convicted prisoner."[28] These rights include the right

---

[21] As a private corporation contracted to operate the medical services in JPCC, the company and its employees are subject to liability as state actors under § 1983. *See* Grandpre v. Correct Health, No. CV 16-1543, 2016 WL 4539442, at *8 (E.D. La. Aug. 29, 2016), *report and recommendation adopted sub nom.* Grandpre v. Health, No. CV 16-1543, 2016 WL 4987265 (E.D. La. Sept. 19, 2016).

[22] LA. REV. STAT. § 15:704.

[23] *Id.*

[24] "Sheriffs in Louisiana are final policy makers with respect to management of the jail. . . . [This] policy-making authority over management of the jail is not the result of a delegation from the Parish or any other local government entity," but rather, the Louisiana Constitution. Jones v. St. Tammany Par. Jail, 4 F. Supp. 2d 606, 613 (E.D. La. 1998) (citing LA. CONST. art. 5 § 27).

[25] Hare v. City of Corinth, 74 F.3d 633, 639 (5th Cir. 1996) (en banc).

[26] *Id.*

[27] *Id.*

[28] *Id.* (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)).

to medical care and the right to protection from known suicidal tendencies, and municipalities may be liable under § 1983 for violating these rights.[29]

"[T]he State's obligation to prevent suicide may implicate a kaleidoscope of related duties, including a duty to provide not only medical care, but also protection from self-inflicted harm."[30] "When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission."[31] Nothing bars a plaintiff from pleading both theories in the alternative.[32] In all but one of the instant Motions, Plaintiffs fail to identify which theory they are pursuing. "If Plaintiffs present sufficient factual evidence as to both theories, then both theories may proceed to the jury."[33]

## DEFENDANT JEFFERSON PARISH

Jefferson Parish seeks dismissal of all claims against it—both federal and state. The federal claim is rooted in constitutional principles, and the state claim in state statutory and contractual law. The Parish's Motion and supporting briefs, however, appear on their face to only address the issues relative to the federal claim. Plaintiffs' opposition brief likewise fails to delineate whether its arguments are in support of the federal or state claims. This Court, therefore, had to parse through the parties' arguments to determine which, if any, were relevant to Plaintiffs' state law claim.

Additionally, Plaintiffs fail to state whether they are pursuing a conditions-of-confinement or episodic-acts-and-omissions claim. As a result,

---

[29] Garza v. City of Donna, 922 F.3d 626, 632 (5th Cir. 2019); Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978).
[30] *Hare*, 74 F.3d at 644.
[31] *Garza*, 922 F.3d at 632 (citing *Hare*, 74 F.3d at 644).
[32] *See* Estate of Henson v. Wichita Cty., 795 F.3d 456, 462 (5th Cir. 2015).
[33] Nagle v. Gusman, No. CV 12-1910, 2016 WL 768588, at *5 (E.D. La. Feb. 26, 2016).

this Court has addressed the arguments of both parties in the context of both claims.

## I.    Federal Claims

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[34] In attempting to hold Jefferson Parish liable under § 1983 for Joshua Belcher's suicide, Plaintiffs aver that the Parish is a policymaker responsible for official policies that were the moving force behind the violation of Joshua Belcher's constitutional due process rights to receive adequate medical care and be protected from known tendencies of self-harm while in custody. While the parties argue over whether the Parish was deliberately indifferent to the serious medical needs of Mr. Belcher, this Court must first determine whether the Parish is a "policymaker" of "official policies" at JPCC. Indeed, if a complained-of policy cannot be attributed to the Parish, then the Parish cannot be held liable as a policymaker.[35]

According to Plaintiffs, "Jefferson Parish knew or should have known that [CH] and the [JPSO] developed various policies that were deliberately indifferent to detainees who were a suicide risk."[36] Plaintiffs aver that JPSO and/or CH have (1) a policy of understaffing the JPCC infirmary and mental health care unit; (2) a policy that allows social workers, not medical doctors, to remove an inmate from suicide watch without reviewing certain data; (3) a policy of releasing detainees from suicide watch straight into general

---

[34] Piotrowski v. City of Hous., 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

[35] "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur." *Id*.

[36] Doc. 138 at 2.

population rather than using a step-down method; and (4) a policy of placing prisoners who are suicide risks into cells that contain implements of suicide. In so stating, Plaintiffs concede that the policies they identify as a moving force in Joshua Belcher's suicide were not policies of the Parish, but policies of CH and the JPSO.[37]

The Parish cannot, however, be liable for the acts of CH and JPSO through a theory of respondeat superior. Indeed, "*Monell* and later [Supreme Court] decisions reject municipal liability predicated on respondeat superior, because the text of section 1983 will not bear such a reading. Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur."[38] The policies articulated by Plaintiffs are policies that are not directly attributable to the municipality, but rather, JPSO and/or CH.

It appears that the only "policy" directly attributable to Jefferson Parish as a "policymaker," based on a generous reading of Plaintiffs' arguments, is a *de facto* policy of not monitoring the policies and practices of CH and JPSO as it relates to the treatment of detainees at JPCC. Even if this Court could find that such a *de facto* policy existed, Plaintiffs must still demonstrate "both municipal culpability and causation. Culpability includes both the involvement of a municipal policymaker and affirmative municipal action."[39] Plaintiffs have demonstrated neither.

To demonstrate municipal culpability, Plaintiffs must show "affirmative municipal action," and that the complained-of *de facto* policy is one of non-

---

[37] This conclusion is bolstered by other statements made in Plaintiffs' brief, such as, "Jefferson Parish should have known that [CH] had a policy of releasing detainees from suicide watch straight into the general population," *id*. at 5, and the Parish "should have known that CH was severely understaffing its infirmary." *Id*.

[38] *Piotrowski*, 237 F.3d at 578.

[39] *Id*. n.17 (internal citation omitted).

action. Second, and more importantly, Plaintiffs fail to demonstrate municipal causation; they fail to explain how Joshua Belcher's suicide was a result of the Parish's *de facto* policy of not monitoring JPSO and CH—and not a result of the deficient policies and practices of CH and/or JPSO. Even if the Parish *did* monitor and oversee the implementation of JPSO and CH policies, for example, Plaintiffs nevertheless fail to demonstrate how this would have prevented Joshua Belcher's suicide. This is because the Parish has no authority to dictate the medical care program at JPCC or the general management of the jail more broadly.

"Sheriffs in Louisiana are final policy makers with respect to management of the jail. . . . [This] policy-making authority over management of the jail is not the result of a delegation from the Parish or any other local government entity," but rather, the Louisiana Constitution.[40] "The Parish has no authority to manage the Sheriff's employees [and] [t]he Parish exercises no power or discretion in the functioning of the Sheriff's office or the jail."[41] Indeed, the Parish is only responsible for the physical maintenance of the brick-and-mortar jail building[42] and appointing a physician or contracting with a health care provider to tend to the medical needs of detainees.[43] As it relates to the Parish's authority to contract with a health care provider, "[t]he sole responsibility [of the Parish] shall be . . . its contractual obligations with [the] health care provider."[44]

Plaintiffs aver that under the Parish's contract with CH, the Parish has a contractual obligation to audit and verify the performance of medical

---

[40] *Jones*, 4 F. Supp. 2d at 613 (citing LA. CONST. art. 5 § 27).
[41] *Id*.
[42] *See* LA. REV. STAT. § 15:702.
[43] *Id*. § 15:703.
[44] *Id*. § 15:703(D).

services. The contract, however, provides for no such obligation. Instead, the contract only requires the Parish to (1) "[p]rovide facilities and equipment for use in the medical program," (2) "[d]esignate a representative who shall be available to Provider as the contract coordinator," (3) "[p]ay for the replacement and/or repair of the medical facilities and/or equipment," and (4) "[m]aintain all medical facilities belonging to the Parish, and for use by Provider, in a reasonable and prudent manner."[45] Plaintiffs appear to read Section 10 of the contract as imposing a responsibility on the Parish to audit and verify CH's performance. Section 10 of the contract, however, only imposes a responsibility on CH "to permit, at all reasonable times, authorized representatives of the Parish to inspect and have access to . . . records . . . for the purpose of auditing and verifying performance."[46] The contract, therefore, does not impose an obligation on the Parish to run regular audits of CH's performance, but merely imposes an obligation on CH to permit the Parish access to records in the event that the Parish does conduct an audit.

Plaintiffs fail to demonstrate that the Parish is a "policymaker" at JPCC for purposes of § 1983 municipal liability. Accordingly, Plaintiffs' federal claims against the Parish must therefore fail.

## II.    State Law Claims

Defendant Jefferson Parish seeks dismissal of all claims against it, which would presumably include state law claims. The Defendant's Motion did not, however, specifically address Plaintiffs' state law claims. In Count V of their Complaint, Plaintiffs raised a state law claim against the Parish for gross negligence and intentional misconduct.[47] Plaintiffs fail to specify, but this

---

[45] Doc. 138-3 at 5–6.
[46] *Id*. at 8.
[47] Doc. 32 at 20.

Court assumes that this claim is brought under Louisiana Revised Statutes
§ 15:703, which provides:

> The parish and its governing authority shall not be liable for any
> action arising as a result of the actions or inactions of the physician
> or health care provider [for the parish jail] . . . unless the governing
> authority exercises gross negligence or willful misconduct in the
> performance of its duties and obligation imposed by this Section,
> and such gross negligence or willful misconduct was a substantial
> factor in causing the injury.

As earlier explained, the Parish's responsibilities are limited to the
physical maintenance of the brick-and-mortar jail building[48] and either
appointing physicians or contracting with health care providers to tend to the
medical needs of detainees.[49] As it relates to the Parish's authority to contract
with a health care provider, "[t]he sole responsibility [of the Parish] shall be . .
. its contractual obligations with [the] health care provider."[50] Plaintiffs do not
allege that the Parish was grossly negligent (or engaged in willful misconduct)
in contracting with CH or in maintaining the JPCC building. Instead,
Plaintiffs appear to argue that the Parish was grossly negligent and/or engaged
in willful misconduct in its execution of the contract with CH.

Plaintiffs aver that under the Parish's contract with CH, the Parish has
a contractual obligation to audit and verify the performance of medical
services. For the reasons discussed above, however, the contract does not
impose an obligation on the Parish to run regular audits of CH's performance,
but merely imposes an obligation on CH to permit the Parish access to records
in the event that the Parish does conduct an audit.

Plaintiffs also appear to argue, albeit less clearly, that the Parish was
grossly negligent and/or engaged in willful misconduct by not enforcing CH's

---

[48] *See* LA. REV. STAT. § 15:702.

[49] *Id*. § 15:703.

[50] *Id*. § 15:703(D).

compliance with the contract. According to Plaintiffs, CH was required to provide monthly reports and notifications of sentinel events to the Parish. Plaintiffs argue that by failing to enforce CH's compliance with its responsibilities under the contract, the Parish was grossly negligent and/or engaged in willful misconduct. Plaintiffs, however, fail to provide this Court with law that supports its position, and this Court was unable to locate a case that found a Louisiana municipality liable for the inactions of its independent contractor under a contract involving pretrial detainees.[51]

In sum, this Court finds that Plaintiffs failed to carry their burden of proof to overcome Jefferson Parish's Motion for Summary Judgment. Plaintiffs failed to demonstrate a material issue of fact regarding the Parish's status as a "policymaker" for purposes of § 1983 municipal liability. Further, even accepting Plaintiffs' arguments under state law as true, Plaintiffs failed to establish that the Parish's inaction rises to the level of gross negligence or led to Belcher's suicide. Accordingly, Jefferson Parish's Motion for Summary Judgment is granted.

---

[51] This Court did locate a test in which a municipality could potentially be liable for the negligence of its independent contractor in *Systems Contractors Corp. v. Williams & Assocs. Architects*, 769 So. 2d 777 (La. App. 5 Cir. 2000). There, the Louisiana appellate court noted that, under Louisiana law, a principal is generally not liable for the offense committed by an independent contractor while performing its contractual duties with two exceptions. *Id.* at 781. The first exception exists where the work performed by the independent contractor is ultra-hazardous. *Id.* The second exception exists when the principal reserves the right to supervise or control the work of the independent contractor. *Id.* In *Systems Contractors Corp.*, the City of New Orleans (through the New Orleans Aviation Board) entered into a contract with Williams and Associates Architects for renovations to the New Orleans International Airport. *Id.* at 779. The court classified the City of New Orleans, a municipality, as the principal and Williams and Associates Architects as an independent contractor. *Id.* at 781. The court found that the City of New Orleans could not be liable for the negligence of its independent contractor because neither exception to the test applied. *Id.* at 782. Perhaps in the instant matter, the second exception may be applicable. Plaintiffs did not, however, present such an argument, and this Court will not retrofit an argument for them.

## DEFENDANTS CORRECTHEALTH AND IRONSHORE

CH and Ironshore's Motion for Summary Judgment seeks dismissal of Plaintiffs' federal claims.[52] Having considered the Complaint and the parties' briefings, it appears that Plaintiffs assert claims against CH arising from both (a) the actions of its employees and (b) its own policies/customs.

### I.   Claims Arising from Actions of CH Employees

"The Court first recognizes that [CH] is the private corporation contracted to operate the medical services within JPCC, and the company and its employees are subject to liability as state actors under § 1983."[53] Here, Plaintiffs did not sue any individual employees of CH, but rather the entity itself. Because Plaintiffs only sued CH, the allegations and arguments Plaintiffs make about CH employees appear to advance a theory of vicarious liability, "which simply is not allowed in an action filed pursuant to § 1983."[54] This does not mean, however, that the actions taken by CH employees are irrelevant to an analysis of CH's potential § 1983 liability. Indeed, if CH employee actions were taken pursuant to a policy or custom of CH, then CH may be liable for that employee's actions.[55]

### II.   Claims Arising from CH Policies/Customs

Because CH cannot be liable for the actions of its employees under a theory of respondeat superior, Plaintiffs must show that the deprivation of Joshua Belcher's "constitutional right was pursuant to a custom, policy,

---

[52] Accordingly, Plaintiffs' state law claims against CH and Ironshore survive summary judgment.

[53] *Grandpre*, 2016 WL 4539442, at *8.

[54] *Id*. (holding that plaintiff's § 1983 claims against CorrectHealth for the actions of CorrectHealth employees were not viable as a matter of law).

[55] "Without a more concrete causal connection between CorrectHealth and the actions of its employees, Plaintiff's claim too closely mirrors simple vicarious liability which is unsustainable in this § 1983 action." Sears ex rel. Sears v. Lee, No. CIV.A. 08-3418, 2010 WL 324385, at *5 (E.D. La. Jan. 20, 2010).

ordinance, regulation or decision."[56] "The test to determine liability for a private prison-management corporation under § 1983 is more or less identical to the test employed to determine municipal or local government liability."[57] As previously articulated, municipal liability under § 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom.[58]

### A. Whether CH is a Policymaker

An entity can only be considered a policymaker for § 1983 purposes if it "takes the place of the governing body in a designated area of city administration."[59] "Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance."[60]

Defendants do not refute that CH is an official policymaker for § 1983 purposes. To the contrary, CH's own corporate representative, Jean Llovet, testified that "[CH's] policies control as to medical decisions and [CH] has medical autonomy."[61] Additionally, as CH was selected by the Parish to run JPCC's medical care program, it acts in place of the municipal governing body.

CH is not supervised. Jefferson Parish has no control over CH policies and practices, and JPSO "conceded that it provides no oversight of [CH's] policies, practices, or procedures" as it relates to CH suicide prevention policies.[62] Even if JPSO did have the authority to supervise CH, it is

---

[56] Robichaux v. Lafourche Par. Det. Ctr., No. CV 17-5680, 2017 WL 5495791, at *8 (E.D. La. Oct. 10, 2017), *report and recommendation adopted*, No. CV 17-5680, 2017 WL 5483780 (E.D. La. Nov. 15, 2017).

[57] *Id*. (citing Alfred v. Corr. Corp., No. 08-CV-0643, 2009 WL 789649, at *2 n.1 (W.D. La. Mar. 24, 2009)).

[58] *Id*. at *9 (citing *Piotrowski*, 237 F.3d at 578).

[59] Webster v. Houston, 735 F.2d 838, 841 (5th Cir. 1984).

[60] *Id*. (quoting Bennett v. City of Slidell, 728 F.2d 762, 769 (5th Cir. 1984) (en banc)).

[61] Doc. 148 at 8.

[62] Doc. 136 at 5 (citing Doc. 136-3 at 4).

undisputed that it exercised no such authority over CH as it relates to the events surrounding Joshua Belcher's pretrial detention. Accordingly, CH is a "policymaker" for purposes of § 1983 liability.

### B. Identification of CH Policies/Customs

An official policy is:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.[63]

"[A] facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result."[64]

Plaintiffs have pointed to numerous official, written policies and several *de facto* policies of CH. Defendants make no argument to contest this element. Accordingly, Plaintiffs have met their burden.

### C. Whether CH Policies/Custom were a Moving Force

Whether a policy can be fairly considered a "moving force" behind a plaintiff's constitutional violation requires an assessment of both culpability and causation.[65] The two types of claims in Fourteenth Amendment suits by pretrial detainees against municipalities—episodic-acts-and-omissions claims

---

[63] *Webster*, 735 F.2d at 841.
[64] *Piotrowski*, 237 F.3d at 579.
[65] *Piotrowski*, 237 F.3d at 580.

or conditions-of-confinement claims—each have tests that address culpability and causation. Plaintiffs, unfortunately, made no effort to identify which type of claim they are pursuing. This Court, therefore, must interpret the parties' arguments in the context of both claims.

## 1. Episodic Acts or Omissions

"To establish municipal liability in an episodic-act case, a plaintiff must show (1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference."[66] "To apply [this] test, each individual's subjective deliberate indifference must be examined separately."[67]

Accordingly, Plaintiffs must first point to a municipal employee who violated Joshua Belcher's constitutional rights.[68] Plaintiffs point to one CH employee, David Jennings. Plaintiffs contend that CH's "seminal act of deliberate indifference was ordering the removal of Josh from suicide watch. Jenning's [sic] decision to order Josh's removal was borne from an abject failure of policy, procedure, and practice of how to identify suicide risk."[69]

Plaintiffs must show that Jennings violated Belcher's rights with subjective deliberate indifference.[70] Once this showing is met, Plaintiffs must establish how this violation emanated from a CH policy or custom that was maintained with objective deliberate indifference.[71]

---

[66] *Garza*, 922 F.3d at 634 (quoting Brumfield v. Hollins, 551 F.3d 322, 331 (5th Cir. 2008)) (internal quotation marks omitted).
[67] Lawson v. Dallas Cty., 286 F.3d 257, 262 (5th Cir. 2002).
[68] *Garza*, 922 F.3d at 637.
[69] Doc. 136 at 11.
[70] *Garza*, 922 F.3d at 637
[71] *Id*.

To make a showing of subjective deliberate indifference, a plaintiff must show that a municipal employee (1) was aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn and that he (2) actually drew the inference.[72] In other words, "a prison official may be held liable . . . only if he knows that inmates face a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it."[73] A plaintiff need not show that the official's response indicated a subjective intention that the harm occur.[74]

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[75]

> For example, if an Eighth Amendment plaintiff presents evidence
> showing that a substantial risk of inmate attacks was
> longstanding, pervasive, well-documented, or expressly noted by
> prison officials in the past, and the circumstances suggest that the
> defendant-official being sued had been exposed to information
> concerning the risk and thus must have known about it, then such

---

[72] *Id*. at 634.

[73] Farmer v. Brennan, 511 U.S. 825, 847 (1994).

[74] *Id*. at 842 ("[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."). CH and Ironshore urge this Court to adhere to a "subjective intention that the harm occur" requirement. Indeed, this Court espoused such a standard in an Order and Reasons on Jefferson Parish's earlier Motion to Dismiss. Doc. 28 at 4. Subsequent to this Court's Order and Reasons, however, the Fifth Circuit in *Garza v. City of Donna*, 922 F.3d 626 (5th Cir. 2019), clarified the subjective deliberate indifference standard. In *Garza*, the Fifth Circuit noted that the "requirement" that a municipal official have a "subjective intention that the harm occur" erroneously elevated the appropriate deliberate indifference standard as articulated in *Farmer v. Brennan. Id*. at 634 (noting that the "'intention' requirement, though taken from statements in decisions of our court, is contrary to the weight of our case law and to the Supreme Court precedent from which our cases flow").

[75] *Farmer*, 511 U.S. at 842 (internal citation omitted).

evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.[76]

However, "it remains open to the official to prove that they were unaware even of an obvious risk to inmate health or safety."[77]

In the instant matter, this Court finds that Plaintiffs have presented sufficient evidence that David Jennings acted with subjective deliberate indifference to the serious medical needs of Joshua Belcher. Jennings was a full-time employee of CH responsible for the mental health treatment of the roughly 900 inmates at JPCC. Jennings is a licensed clinical social worker. On August 13, 2017, Joshua Belcher attempted to commit suicide while he was being detained at JPCC. As a result of this failed attempt, he was sent to the infirmary and placed on suicide watch. Jennings evaluated Belcher twice: first on August 14, 2017, and again on August 15, 2017, when he discharged him from suicide watch. Plaintiffs aver, and Defendants do not dispute, that both evaluations lasted less than twenty minutes.[78] Defendants argue that on the day Belcher was discharged from suicide watch, Jennings' exam findings of Belcher were normal. Jennings also asked him about suicidal ideations, and Belcher denied having any.

Defendants argue that Jennings could not have had subjective knowledge that Belcher presented a substantial risk of committing suicide where the decedent denied having suicidal thoughts. Defendants cite to *Minix*

---

[76] *Id.* at 842–43 (internal quotation marks omitted).

[77] *Id.* at 844.

[78] The approximately twenty minutes in which Jennings "evaluated" Belcher includes the time in which Jennings observed Belcher on the infirmary cameras, spoke to the nurse about Belcher's behavior while in the infirmary, and then met with Belcher. It can therefore be inferred that the time in which Jennings actually spoke with Belcher was much less than twenty minutes. *See* Doc. 136-12 at 25–26. In fact, Jennings testified that he normally spends "5 to 10 minutes, maybe 15 minutes" talking to the inmate during an evaluation. *Id.* at 26.

*v. Canarecci*, a case from the Seventh Circuit, in support.[79] In *Minix*, the decedent attempted suicide in the month prior to his detention.[80] He then spent about a month in jail without any actual attempt at committing suicide and was sent to suicide watch only because a blade was missing from his razor.[81] After two days of observation on suicide watch, the decedent denied suicidal ideation and "displayed no such strange behavior or any obvious signs that he was an imminent suicide risk."[82] He committed suicide the day he was discharged from suicide watch.[83] The Seventh Circuit held that the employee who discharged the decedent from suicide watch could not have been subjectively deliberately indifferent to the decedent's suicide risk because the decedent denied suicidal ideations.[84]  *Minix*, however, is easily distinguishable from the matter at hand.

Unlike the decedent in *Minix*, who made no prior suicide attempt while in prison and was placed on suicide watch only because of a missing razor, Belcher's behavior at JPCC unambiguously evidenced his elevated risk for suicide. At the time Jennings discharged Belcher from suicide watch on August 15, 2017, Jennings knew, at a minimum, that: (1) Belcher had made an actual suicide attempt in JPCC on August 13, 2017; (2) Belcher had been experiencing symptoms of withdrawal while at JPCC; and (3) less than two weeks prior, his (Jenning's) premature discharge of an inmate from suicide watch resulted in the successful suicide of Jerome Bell. Despite this knowledge, Jennings discharged Belcher from suicide watch after two interviews with Belcher, each

---

[79] 597 F.2d 824 (7th Cir. 2010).
[80] *Id*. at 828.
[81] *Id*.
[82] *Id*. at 833.
[83] *Id*. at 829.
[84] *Id*. at 833.

of which lasted less than twenty minutes, and without conducting a pertinent diagnostic assessment.

A reasonable factfinder could therefore conclude that Jennings drew an inference of a substantial risk of harm to Belcher from the very fact that Belcher's risk of suicide was obvious.[85] Moreover, by ordering Belcher's discharge from suicide watch with full knowledge of Belcher's high risk of self-harm, a factfinder could easily find that Jennings disregarded that risk. Having demonstrated that a reasonable factfinder could find Jennings subjectively indifferent to Belcher's substantial risk of harm, Plaintiffs must also show how this violation emanated from a policy or custom that CH maintained with objective deliberate indifference. Here too, Plaintiffs meet their burden by demonstrating that Jennings was simply following CH policies and practices when he discharged Belcher from suicide watch.

First, CH's suicide prevention policy was authored by Jean Llovet, a nurse and corporate representative for CH. Llovet has written no other suicide prevention policies, and she testified that she was not qualified to make decisions regarding the removal of someone from suicide watch.[86] She even acknowledged that she could not identify any industry standards or written guidelines for completing a suicide risk assessment to determine when to remove someone from suicide watch.[87] Despite this, CH thought it was prudent to have her author its suicide prevention policy.

Second, CH did not provide Jennings (or presumably, any of its other employees) with written criteria to follow or standards to abide by when determining whether an inmate should be removed from suicide watch.

---

[85] *Farmer*, 511 U.S. at 842 (internal citation omitted).
[86] Doc. 136-4 at 18–19.
[87] *Id*.

Finally, Plaintiffs' expert testimony supports a finding of objective deliberate indifference by CH as well. Dr. Jeremy Colley opined that the psychiatric services received by Belcher at JPCC grossly departed from the standard of care with regard to suicide risk assessment and management and that these gross departures caused Belcher's death by suicide.[88] Dr. Colley noted that CH policies and practices permitted Jennings to release Belcher from suicide watch (a) without pertinent diagnostic testing or risk factor assessment, (b) relying solely on the decedent's own account of his mental state, and (c) without developing a plan for treatment after discharge.[89] Indeed, Dr. Colley referred to CH's suicide prevention policy as "the worst risk assessment [he has] yet to encounter in [his] career."[90]

Dr. Venters also identified deviations and deficiencies in CH policies that paved the way for Joshua Belcher's suicide. Specifically, Dr. Venters identified deficiencies surrounding (1) CH's policies for handling inmates with alcohol or heroin withdrawal; (2) CH's policies for placement and transfer of inmates with suicide risk and other mental health problems; and (3) CH's policies for monitoring inmates after being discharged from suicide watch.[91]

Accordingly, the Court finds sufficient evidence to show that Jennings' decision to discharge Belcher from suicide watch emanated from the policies and practices of CH that were maintained and adopted with objective deliberate indifference. Plaintiffs, therefore, can proceed to trial on an episodic-acts-or-omissions theory of recovery against CH as outlined herein

## 2. Conditions of Confinement

---

[88] Doc. 136-17 at 2.

[89] *Id*. at 11.

[90] *Id*. at 13.

[91] *See* Doc. 136 at 22. This Court was unable to locate Dr. Venters' expert report; it appears Plaintiffs failed to attach it. Regardless, Dr. Colley's expert report is sufficient to overcome summary judgment on this issue.

"A condition is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation, etc."[92] "[I]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate."[93] "Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights."[94]

"If a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."[95] Whatever the condition or restriction may be, it "must be 'not reasonably related to a legitimate governmental objective' and must cause the inmate's constitutional deprivation."[96]

Thus, "[t]o maintain a condition-of-confinement claim, a plaintiff must show (1) a condition of an inmate's confinement that is (2) not reasonably related to a legitimate governmental interest and that (3) violated the inmate's constitutional rights."[97]

In the instant Motion, Plaintiffs identify numerous written and *de facto* policies of CH. Plaintiffs and Defendants also spend considerable time arguing over whether these policies played a role in CH's violation of Joshua Belcher's

---

[92] Shepherd v. Dallas Cty., 591 F.3d 445, 452 (5th Cir. 2009).

[93] *Id*. at 454.

[94] *Id*.

[95] *Garza*, 922 F.3d at 632 (quoting Bell v. Wolfish, 441 U.S. 520, 535 (1979)).

[96] *Id*. at 632–33 (quoting *Bell*, 441 U.S. at 535).

[97] *Nagle*, 2016 WL 768588, at *9 (citing Edler v. Hockley Cty. Comm'rs Court, 589 F. App'x 664, 668 (5th Cir. 2014)).

constitutional rights. Both parties fail, however, to make any argument about whether these policies were reasonably related to a legitimate governmental interest—an element necessary for a conditions-of-confinement claim. Defendants, as the movants seeking dismissal of all federal claims against them, bear the burden of showing no issue of material fact as to this condition-of-confinement theory.[98] As the issue was not briefed, the Court declines to fully address the merits of Plaintiffs' condition-of-confinement claim here.

The Court does find, however, that there is sufficient evidence for Plaintiffs' claim to survive summary judgment. As the Court detailed in the previous section, there is evidence of serious deficiencies in CH's assessment and treatment of suicidal inmates. A reasonable factfinder could therefore conclude that CH's policies, or lack thereof, create a condition of confinement, that is not reasonably related to a legitimate governmental interest, and that violates the constitutional rights of inmates at JPCC. Plaintiffs may therefore proceed with this theory of recovery.

## DEFENDANTS NEWELL NORMAND AND JOSEPH LOPINTO

Defendants Newell Normand and Joseph Lopinto are sued by Plaintiffs in their individual and official capacities as current and former Sheriffs of Jefferson Parish. These Defendants seek dismissal of all § 1983 claims against them.[99] This Court will assess each claim in turn.

### I.   Individual Capacity Claims

"Supervisory officials may be held [individually] liable only if: (i) they affirmatively participate in acts that cause [a] constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's

---

[98] *Engstrom*, 47 F.3d at 1462.
[99] Accordingly, Plaintiffs' state law claims remain.

injury."[100] Plaintiffs present this Court with no evidence—and make no allegations—of the individual involvement or participation of Defendants Normand and/or Lopinto in the events surrounding Joshua Belcher's suicide. As a result, Plaintiffs' claims against Defendants Normand and Lopinto in their individual capacities must fail.

## II.   Official Capacity Claims

"A suit against a government official in his official capacity is treated as suit against the entity."[101] A suit against the Jefferson Parish Sheriffs in their official capacities must therefore be treated as a suit against the municipal entity of the Jefferson Parish Sheriff's Office. Again, the test for municipal liability requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[102]

### A. Whether JPSO is a Policymaker

An entity can only be considered a policymaker for § 1983 purposes if it "takes the place of the governing body in a designated area of city administration."[103] "Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance."[104]

"Sheriffs in Louisiana are final policy makers with respect to management of the jail . . . [This] policy-making authority over management of the jail is not the result of a delegation from the Parish or any other local

---

[100] Mouille v. City of Live Oak, 977 F.2d 924, 929 (5th Cir. 1992) (citing Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1985) (per curiam)).

[101] Lee v. Morial, No. CIV. A. 99-2952, 2000 WL 726882, at *2 (E.D. La. June 2, 2000) (citing Kentucky v. Graham, 473 U.S. 159, 165–66 (1985)).

[102] Piotrowski, 237 F.3d at 578 (citing Monell, 436 U.S. at 694).

[103] Webster, 735 F.2d at 841.

[104] Id. (quoting Bennett, 728 F.2d at 769 (en banc)).

government entity," but rather, the Louisiana Constitution.[105] "The Parish has no authority to manage the Sheriff's employees [and] [t]he Parish exercises no power or discretion in the functioning of the Sheriff's office or the jail."[106] Moreover, "[e]ach sheriff shall be the keeper of the public jail of his parish."[107]

Because Sheriffs are the keepers of parish jails and the final policymakers with respect to jail management, this Court finds that Sheriffs Normand and Lopinto in their official capacities (hereinafter "JPSO") are "policymakers" for purposes of § 1983 liability.

## B. Identification of JPSO Policies/Custom

Plaintiffs point to two varieties of policy and/or custom that they attribute to JPSO: (1) those related to medical treatment and (2) those related to jail management.

As to medical treatment, Plaintiffs attempt to place responsibility for Joshua Belcher's medical treatment with both CH and JPSO, arguing that the two "share" medical responsibilities. As this Court has previously found, however, CH is the only entity responsible for providing medical care to inmates at JPCC. Plaintiffs also attempt to charge JPSO with liability for the "practice[s] of the entire mental health and suicide prevention staff (one social worker)."[108] "*Monell* and later [Supreme Court] decisions," however, "reject municipal liability predicated on respondeat superior." Consequently, the unconstitutional conduct of JPSO must be directly attributable to the municipality through some sort of official action or imprimatur."[109] JPSO,

---

[105] *Jones*, 4 F. Supp. 2d at 613 (citing LA. CONST. art. 5 § 27).
[106] *Id.*
[107] LA. REV. STAT. § 15:704.
[108] Doc. 139 at 10.
[109] *Piotrowski*, 237 F.3d at 578.

therefore, cannot be liable for (1) the quality of medical care provided by CH or (2) the actions/inactions of a CH employee.

Plaintiffs also argue that JPSO policies of jail management are responsible for Belcher's suicided. As Plaintiffs note:

> The Sheriff is additionally liable for a reason other than assisting to providing medical care. The Sheriff placed Josh into a cell where another inmate who was also released from suicide watch committed suicide . . . Josh was remanded to this particular cell directly from suicide watch, escorted by at least one Sheriff's Deputy. The Sheriff's Office chose which cell to place Josh into.[110]

Plaintiffs thus argue that JPSO had a custom of placing inmates who were a known risk of suicide and/or who were discharged from suicide watch into cells with implements of suicide and without proper monitoring standards. Plaintiffs argue that this is a "custom" for § 1983 purposes, evidenced by the suicides of Jerome Bell and Jatory Evans—which took place shortly before and after Joshua Belcher's and in a manner identical to Joshua Belcher.

The Court acknowledges that a policy or custom for § 1983 municipal liability need not be a formal, written policy, but may be "[a] persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[111] Plaintiffs, however, have not presented sufficient evidence to establish that the above described practices were official policy of JPSO at the time of Joshua Belcher's suicide.

It is true that Joshua Belcher, Jatory Evans, and Jerome Bell were all transferred to isolation-type cells in the Administrative Segregation pod following their time on suicide watch. There is no evidence, however, that

---

[110] Doc. 139 at 4–5.
[111] *Webster*, 735 F.2d at 841.

Joshua Belcher, Jatory Evans, and Jerome Bell were transferred to the Administrative Segregation pod *because* they were leaving suicide watch. To the contrary, there is evidence that extraneous circumstances led to JPSO's decision to transfer the inmates to those particular cells.[112] Plaintiffs, therefore, can only point to the existence of the one suicide preceding Belcher's as evidence of JPSO's customary practice.

Plaintiffs look to the case of *Woodard v. Correctional Medical Services of Illinois, Inc.*, as supporting their proposition that the one prior suicide was sufficient to evidence a JPSO policy.[113] In *Woodard*, the Seventh Circuit found that defendants "[do] not get a 'one free suicide' pass" and "that evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act."[114] *Woodard*'s holding, however, does not create the corollary that one suicide is sufficient to demonstrate municipal liability. Rather, the *Woodard* court's statements were made with respect to causation, finding that the lack of prior suicides at the prison did not obviate the possibility that the defendant's policies led to the inmate's suicide. Unlike in *Woodard*, Plaintiffs in the current matter have not presented any evidence of practices constituting policy or

---

[112] On August 13, Joshua Belcher informed JPSO that he felt his life was in danger because of certain enemies he had made in the pod. Doc. 136-15 at 20. JPSO accordingly arranged for his transfer to another cell. While in the Southwing "holding cell" awaiting transfer, Belcher made his first suicide attempt. Security records for the following day indicate that Belcher had been placed on suicide watch and "that once cleared, will be sent to administrative segregation *due to fears of safety*." Doc. 139-7 at 3. The evidence therefore suggests that Belcher was released to the Administrative Segregation pod because of his initial fear of other inmates, not because he was leaving suicide watch. Additionally, JPSO records indicate that Jatory Evans "wanted to be placed into the Isolation Cell" because "he was having problems with others on the tier and was afraid he would get into trouble." Doc. 136-14 at 5. These facts constitute the only evidence the Court could find as to why the inmates were transferred to the Administrative Segregation pod.

[113] 368 F.3d 917 (7th Cir. 2004).

[114] *Id.* at 129.

custom. "To prevail on a *de facto policy* theory, plaintiffs must demonstrate that [JPSO's] conduct was sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials."[115] As there is no evidence that the transfer of inmates from suicide watch to Administrative Segregation was typical conduct for JPSO, Plaintiffs have failed to demonstrate that such conduct constituted JPSO policy.

Additionally, even if such a practice existed, there is no evidence that the custom of moving inmates into the Administrative Segregation pod was enacted with the deliberate indifference necessary to support a finding of liability.[116] Rather, the evidence consistently demonstrates that any deliberate indifference as to "the known or obvious consequences" of Belcher's housing is attributable to CH, not JPSO. In fact, Plaintiffs own expert repeatedly noted that it was David Jennings who should have alerted JPSO to the dangers of solitary housing. Plaintiffs' expert found that it was Jennings who "fail[ed] to even acknowledge the suicide risk that the next housing area will pose to Mr. Belcher" and that it was Jennings' *approval* of Belcher's transfer to a segregation unit that constituted a "gross deviation from NCCHC and community standards for non-acutely suicidal patients."[117] Jennings himself testified that he could have informed JPSO that Belcher required communal housing or remained at an elevated suicide risk, but that he found such actions unnecessary as he believed Belcher to be at a "low risk" for suicide.[118] Plaintiffs even characterize Belcher's transfer to the isolation cell as inappropriate

---

[115] Nagle, 2016 WL 768588, at *9 (quoting Estate of Hensen v. Wichita Cty., Tex., 795 F.3d 456, 465 (5th Cir. 2015)).

[116] "[A] facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski*, 237 F.3d at 579.

[117] Doc. 139-7 at 8.

[118] Doc. 136-12 at 37–39.

"*healthcare procedure*."[119] To find deliberate indifference on behalf of JPSO would be to require JPSO to make an additional, independent examination of Belcher's mental health, which was not an obligation of JPSO.

Additionally, the Court notes that JPSO sent Belcher to Administrative Segregation out of fears for his safety:[120] a fact that cuts directly against a finding of deliberate indifference.

Having already found that JPSO cannot be vicariously liable for the acts or omissions of CH, this Court cannot find any evidence of JPSO policy or custom sufficient to support a finding of municipal liability. Plaintiffs' claims against JPSO are accordingly dismissed.

## CONCLUSION

For the foregoing reasons, Defendant Jefferson Parish's Motion for Summary Judgment (Doc. 110) is **GRANTED**, and all claims against it are **DISMISSED WITH PREJUDICE**.

Defendants CorrectHealth and Ironshore's Motion for Summary Judgment (Doc. 131) is **DENIED**. All claims against these Defendants remain pending, and Plaintiffs may proceed to trial on an (1) episodic-acts-or-omissions theory of recovery and (2) a condition-of-confinement theory of recovery.

Defendants Lopinto and Normand's Motion for Summary Judgment (Doc. 132) is **GRANTED,** and all claims against them are **DISMISSED WITH PREJUDICE**.

---

[119] Doc 139-8 at 6.
[120] Doc. 139-7 at 3.

New Orleans, Louisiana this 2nd day of October, 2020.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**