UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JAYNE BELCHER ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-7368** |
| **JOSEPH LOPINTO, III ET AL.** | **SECTION: "H"** |

## ORDER AND REASONS

Before the Court is Defendants' Motion to Alter the Court's Ruling that Denied Defendants' Motion for Summary Judgment (Doc. 206). For the following reasons, the Motion is **DENIED**.

## BACKGROUND

This action arises out of Joshua Belcher's suicide at the Jefferson Parish Correctional Center ("JPCC") in Gretna, Louisiana, where he was being held as a pretrial detainee. Following his death, Belcher's parents, Jayne and Jimmy Belcher ("Plaintiffs"), filed this suit, alleging violations of 42 U.S.C. § 1983 and state law against Joseph P. Lopinto, III and Newell Normand, as the current and former Sheriffs of Jefferson Parish, respectively; Jefferson Parish; CorrectHealth Jefferson, L.L.C. ("CH"), the entity with whom Jefferson Parish contracted to provide healthcare services at JPCC; and Ironshore Specialty Insurance Co., the insurance provider for CH. On September 9, 2020, this Court issued an Order granting summary judgment in favor of the Sheriffs and

1

Jefferson Parish and denying summary judgment in favor of CH and Ironshore.[1] On October 5, 2020, this Court issued its reasons for judgment.[2]

Currently before the Court is CH and Ironshore's (collectively, "Defendants") Motion to Alter the Court's Ruling that Denied Defendants' Motion for Summary Judgment. In the Motion, Defendants argue that this Court committed legal and factual error in its Order and Reasons denying Defendants' Motion for Summary Judgment. Accordingly, Defendants ask that this Court amend its previous Order, grant summary judgment in their favor, and dismiss Plaintiffs' claims against them.

As a preliminary matter, the parties dispute the legal standard applicable to Defendants' Motion. Specifically, the parties dispute whether the Court should analyze Defendants' request for reconsideration under Federal Rule of Civil Procedure 54 or 59. "Rule 59(e) governs motions to alter or amend a final judgment; Rule 54(b) allows parties to seek reconsideration of interlocutory orders."[3] As the denial of a summary judgment motion is an interlocutory decision,[4] the Court finds that Federal Rule of Civil Procedure 54 is the appropriate standard under which to review Defendants' Motion.

## **LEGAL STANDARD**

A Motion for Reconsideration of an interlocutory order is governed by Federal Rule of Civil Procedure 54(b).[5] "Under Rule 54(b), 'the trial court is

---

[1] *See* Doc. 185.
[2] *See* Doc. 197.
[3] Austin v. Kroger Tex., L.P., 864 F.3d 326, 336 (5th Cir. 2017).
[4] Acoustic Sys., Inc. v. Wenger Corp., 207 F.3d 287, 290 (5th Cir. 2000) ("Because the denial of a summary judgment motion is not a final decision of the district court, the order presently under review by this court is interlocutory." (citations omitted)).
[5] FED. R. CIV. P. 54(b) (noting that a district court may revise at any time prior to final judgment "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties"). *See* McClendon v. United States, 892 F.3d 775, 781 (5th Cir. 2018).

2

free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.'"[6]

## LAW AND ANALYSIS

In this Court's Order and Reasons denying Defendants' Motion for Summary Judgment, this Court held that a reasonable jury could find that Defendants violated Joshua Belcher's ("Belcher") constitutional rights under 42 U.S.C. § 1983. "The test to determine liability for a private prison-management corporation [like CH] under § 1983 is more or less identical to the test employed to determine municipal or local government liability."[7] Accordingly, in denying Defendants' Motion for Summary Judgment, this Court had to find that CH was a policymaker for purposes of § 1983 liability and that CH promulgated an official policy or custom that was the moving force behind the constitutional violation. This Court found that: CH was a policymaker; that Plaintiffs presented sufficient evidence of "numerous official, written policies and several *de facto* policies of CH;" that CH's employee, David Jennings ("Jennings"), acted with subjective deliberate indifference when he evaluated and released Belcher from suicide watch; and that Jennings was acting pursuant to CH policies and practices at the relevant time.[8] In the instant Motion, Defendants argue that this Court made a series of legal and factual errors in reaching these conclusions. Defendants now ask this Court to

---

[6] *Austin*, 864 F.3d at 336 (quoting Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 185 (5th Cir. 1990)).

[7] Robichaux v. Lafourche Par. Det. Ctr., No. CV 17-5680, 2017 WL 5495791, at *8 (E.D. La. Oct. 10, 2017), *report and recommendations adopted*, No. CV 17-15680, 2017 WL 5483780 (E.D. La. Nov. 15, 2017) (citing Alfred v. Corr. Corp., No. 08-CV-0643, 2009 WL 789649, at *2 n.1 (W.D. La. Mar. 24, 2009)).

[8] *See* Doc. 197 at 15–25.

3

amend the alleged errors and grant their Motion for Summary Judgment. This Court will address each alleged error in turn.

## A. Alleged Factual Errors

### 1. *Whether Jennings Evaluated Jerome Bell*

In denying Defendants' Motion for Summary Judgment, this Court found, in part, that Plaintiffs presented sufficient evidence that Jennings acted with subjective deliberate indifference to the serious medical needs of Belcher. In so holding, this Court found probative the fact that:

> [a]t the time Jennings discharged Belcher from suicide watch on August 15, 2017, Jennings knew, at a minimum, that: (1) Belcher had made an actual suicide attempt in JPCC on August 13, 2017; (2) Belcher had been experiencing symptoms of withdrawal while at JPCC; and (3) less than two weeks prior, his (Jenning[s']) premature discharge of an inmate from suicide watch resulted in the successful suicide of Jerome Bell.[9]

Now, Defendants argue that there is evidence that Jerome Bell ("Bell") was never on suicide watch or evaluated by Jennings and that this Court consequently erred in finding Jennings deliberately indifferent. Specifically, Defendants argue that Jennings' deposition testimony demonstrates that Jennings had no recollection of assessing Bell and that Dr. Carlo Musso ("Dr. Musso") "confirmed" in his testimony that Bell was not on suicide watch or assessed by Jennings. Having reviewed the relevant portions of both Jennings' and Dr. Musso's depositions, this Court finds that the testimonies, at the very least, create a genuine issue of material fact as to whether Jennings evaluated and discharged Bell.

The relevant testimony from Jennings' deposition reads as follows:

Q:   Okay. Jerome Bell, was Jerome Bell on suicide watch in the infirmary while he was . . . incarcerated?

---

[9] *See id.* at 21.

4

> A:   I think so. I don't remember Jerome Bell hardly at all, though. I can't even think of - - - yeah. I'm sure he was on suicide watch once. I'm pretty sure recalling the name.
> Q:   Did - - - were you the one responsible for discharging him from suicide watch?
> A:   I think so. I'm not sure, but I think so.
> [ . . . ]
> Q:   Did you make any inquiries as to how [Bell, Belcher, and Jatory Evans] committed suicide and whether any steps could have been taken to prevent it?
> A:   Yeah. There's - - there's - - you know, the charts we read and the notes that come up, you know, we read through to see what happened and, you know, how it occurred. So, yeah, we would have discussed that in a - - one of the provider staff meetings. I think we would have discussed it.[10]

Although Jennings was struggling to recollect, he ultimately testified that he was "sure" that Bell had been on suicide watch and that he believed he was the one to discharge him. To the extent that Defendants are asking this Court to discredit Jennings' testimony because of his alleged uncertainty, this Court finds that such a credibility determination should be left to the jury.

Defendants also argue that Dr. Musso's testimony "confirms" that Bell was never on suicide watch. Specifically, Defendants point to a portion of Dr. Musso's testimony wherein Dr. Musso is asked whether Bell's psychological autopsy represents that Bell was on suicide watch or seen by Jennings. In response, Dr. Musso stated that "[t]his is not a review of his medical records, so. But according to this summary, it doesn't appear that he was on suicide watch."[11] Dr. Musso also found that "this particular summary" does not indicate that Jennings evaluated Bell.[12] Defendants argue that these statements conclusively establish that Bell was never on suicide watch or

---

[10] Doc. 136-12 at 46–47.
[11] Doc. 206-2 at 1.
[12] *Id.* at 2.

evaluated by Jennings. This Court disagrees. Defendants essentially argue that the psychological autopsy's silence as to Bell's time on suicide watch or evaluation by Jennings proves that such events never occurred. Defendants, however, provide no support for this assertion. Additionally, Dr. Musso's testimony suggests that Bell's medical records may reveal information lacking in the psychological autopsy. Accordingly, this Court denies Defendants' request to reverse this Court's ruling on this ground.

Moreover, this Court notes that Defendants' arguments relating to Jennings' evaluation of Jerome Bell are markedly absent from Defendants' original Motion for Summary Judgment or Reply to their Motion for Summary Judgment. Indeed, in reviewing the original motions, this Court could not even locate the at-issue portion of Dr. Musso's deposition testimony. This Court thus finds that the latency of Defendants' arguments on these alleged factual issues provide additional cause to deny Defendants' Motion on this ground.

*2. Whether Jennings Conducted a Pertinent Diagnostic Assessment*

Defendants next argue that this Court's finding that Jennings discharged Belcher "without conducting pertinent diagnostic assessment" is contradicted by the testimony of Plaintiffs' own experts. Specifically, Defendants argue that Dr. Jeremy Colley ("Dr. Colley") and Dr. Homer Venters' ("Dr. Venters") testimonies demonstrate that Jennings conducted an appropriate suicidal risk assessment at the time Belcher was released from suicide watch. This Court disagrees.

Defendants contend that Dr. Colley's testimony confirms that Jennings addressed all the pertinent suicide risk factors in his evaluation of Belcher. The testimony to which Defendants cite for this proposition, however, does not indicate the time at which the discussed assessment took place or demonstrate that Dr. Colley approved of said assessment. To the contrary, Dr. Colley

testified that Jennings "did not perform anywhere near the standard of care with regards to a suicide risk assessment nor making a diagnosis or treatment plan nor follow-up care."[13] In the deposition, the deposer lists elements of the relevant diagnostic test, the "CIWA," and asks Dr. Colley to confirm that Jennings addressed these in his evaluation of Belcher. In response, Dr. Colley admits that Jennings made notes that could be construed to relate to CIWA elements but explains that "the CIWA in and of itself is not a suicide risk assessment" and that "Jennings fell well below the standard of care by simply basing his risk assessment with regards to withdrawal on Belcher's self report."[14] Dr. Colley later confirms that "an adequate full suicide risk assessment and diagnostic assessment . . . wasn't done in this case."[15] Accordingly, this Court disagrees with Defendants' characterization of Dr. Colley's testimony.

The Court finds Defendants' characterization of Dr. Venters' testimony equally misleading. In Dr. Venters' deposition, the deposer again attempts to lead Dr. Venters into confirming that many of the pertinent CIWA factors are represented in Jennings' report.[16] Dr. Venters, however, explains that the representations in Jennings' report indicate "a normal finding" without doing an actual "CIWA or COWS" assessment.[17] Indeed, Dr. Venters testified that

> [t]here's like very brief mention of a couple of protective factors, but not -- there's no real suicide risk assessment here, and so that's a -- that stands out. Aside from the problem with the lack of CIWA for his withdrawal symptoms, that really stands out as the

---

[13] Doc. 131-3 at 13.
[14] *Id.* at 17.
[15] *Id.* at 24.
[16] Doc. 131-4 at 38–39.
[17] *Id.* at 40.

7

primary failing of this encounter and it's kind of contribution to his risk of death.[18]

This Court therefore does not find that Dr. Colley's or Dr. Venters' testimony contradicts this Court's finding that Jennings discharged Belcher from suicide watch without conducting a pertinent diagnostic assessment.

*3. Whether Defendants Argued the Existence of a CH Policy*

Defendants assert that this Court erred when it held that "Defendants made 'no arguments to contest' Defendants' policies were 'promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result.'"[19] This Court made no such statement.

To find that Defendants acted with deliberate indifference, Plaintiffs had to identify a CH policy or custom and demonstrate that the CH policy or custom was a moving force behind the constitutional violation. This Court found that "Defendants ma[de] no argument to contest [Plaintiffs' identification of CH policies]."[20] This Court did not, however, find that Defendants failed to present arguments as to whether the identified policies or customs were moving forces behind the constitutional violation. To the contrary, this Court addressed many of CH's arguments as to this element.

Additionally, CH argues that this Court erred in finding CH's policies deficient. Specifically, CH argues that "the Court's finding that CorrectHealth's Suicide Prevention Policy is inadequate *simply because a nurse drafted it* is contrary to Plaintiffs' experts' testimony and NCCHC findings."[21] This statement is a gross misrepresentation of the Court's discussion of CH's policy. Contrary to Defendants' contention, this Court found

---

[18] *Id.* at 41.
[19] Doc. 206-1 at 15.
[20] Doc. 197 at 17.
[21] Doc. 206-1 at 16 (emphasis added).

8

CH's suicide prevention policy deficient, in part, because Jean Llovet, the author of the policy, testified that "she was not qualified to make decisions regarding the removal of someone from suicide watch" and "acknowledged that she could not identify any industry standards or written guidelines for completing a suicide risk assessment to determine when to remove someone from suicide watch."[22] This Court thus rebukes Defendants' contention that this Court's finding was solely attributable to the author's profession. Therefore, Defendants' Motion to Alter the Court's Ruling on the ground that this Court made factual errors related to CH's suicide prevention policy is denied.

*4. Whether Belcher's Housing was Attributable to CH*

Defendants argue that "because there is no evidence showing Jennings approved Decedent being moved to segregation, this Court erred in finding that Decedent's 'housing is attributable to' CorrectHealth."[23] Again, Defendants misconstrue the Court's finding. This Court found that "any deliberate indifference as to the 'known or obvious consequences' of Belcher's housing is attributable to CH."[24] This Court then cited to evidence from both Plaintiffs' experts' reports and Jennings' testimony that supports the finding that Jennings could, and should, have intervened in Belcher's transfer to administrative segregation.[25] This Court therefore rejects Defendants' contention that the Court's finding is unsupported by the record and denies Defendants' Motion to Alter the Judgment on this ground.[26]

---

[22] Doc. 197 at 22.
[23] *See* Doc. 206-1 at 17.
[24] Doc. 197 at 30.
[25] *See Id.* at 30–31.
[26] Further, the Court notes that these findings were made in relation to JPSO's Motion for Summary Judgment—not Defendants' Motion for Summary Judgment.

9

### B. Legal Errors

*1. Whether this Court's Ruling is Consistent with Fifth Circuit Precedent*

Defendants argue that this Court's ruling is contrary to the Fifth Circuit's ruling in *Domino v. Texas Department of Criminal Justice*.[27] In *Domino*, the Fifth Circuit held that the psychiatrist's incorrect diagnosis that the prisoner was not suicidal after a five-minute evaluation did not equate to deliberate indifference.[28] Defendants now argue that, under *Domino*, this Court erred when it found that Jennings' two "less than twenty-minute" meetings with Belcher were insufficient.

The Fifth Circuit in *Domino* found that the prisoner was not "so obviously suicidal" that the psychologist "must have known yet disregarded that risk."[29] In reaching that conclusion, the Fifth Circuit noted that: the *Domino* prisoner had been actively monitored by the psychiatrist for approximately five months at the time he committed suicide; that, on the day of his suicide, the *Domino* prisoner was evaluated by both a prison psychologist and a psychiatrist, with each evaluation lasting approximately five minutes; and that the *Domino* prisoner had a history of making empty suicide threats.[30] Thus, contrary to Defendants' contentions, the *Domino* court did not simply find the psychiatrist's five-minute meeting with the prisoner dispositive. Rather, the brevity of the psychiatrist's final meeting with the prisoner was analyzed within the context of the longstanding physician-patient relationship. This Court finds *Domino* distinguishable as there is evidence that, at the time Jennings discharged Belcher from suicide watch, Jennings had only briefly evaluated Belcher once before, Belcher was experiencing

---

[27] Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752 (5th Cir. 2001).
[28] *Id.* at 756.
[29] *Id.* at 757.
[30] *Id.* at 753, 756.

10

symptoms of withdrawal, Belcher had attempted to commit suicide two days prior, and Jennings' recent discharge of Jerome Bell resulted in Bell's suicide. Accordingly, this Court does not find that *Domino* warrants a reversal of summary judgment.

Defendants also argue that this Court erred when it found *Minix v. Canarecci* distinguishable.[31] This Court previously presented a full analysis of *Minix* in its Order and Reasons. To avoid repetition, this Court will not address Defendants contentions again here.

### 2. *Whether this Court Erred in Finding Deliberate Indifference*

Defendants argue that this Court erred in denying Defendants' Motion for Summary Judgment because Plaintiffs failed to prove objective deliberate indifference. First, Defendants argue that this Court erred in finding that the record supported a finding of deliberate indifference where Plaintiff's expert, Dr. Colley, stated that he "does not believe [CorrectHealth] was intentional" in its suicide risk assessment practices.[32] Defendants now argue that Dr. Colley's finding forecloses a finding that CH made a "deliberate" or "conscious choice" to endanger Belcher's constitutional rights.

"A municipal 'policy' must be a deliberate and conscious choice by a municipality's policy-maker."[33] "While the municipal policy-maker's failure to adopt a precaution can be the basis for § 1983 liability, such omission must amount to an intentional choice, not merely an unintentionally negligent oversight."[34] The failure does not rise to the level of "intentional" unless it can be considered deliberately indifferent.[35] "A failure to adopt a policy can be

---

[31] Minix v. Canarecci, 597 F.3d 824 (7th Cir. 2010).
[32] *See* Doc. 206-1 at 20 (quoting Doc. 136-17 at 13 (Dr. Colley's Expert Report)).
[33] Rhyne v. Henderson Cty., 973 F.2d 386, 392 (5th Cir. 1992) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989)),
[34] *Id.* (quoting *City of Canton,* 489 U.S. at 387).
[35] *Id.* (citing *City of Canton,* 489 U.S. at 390)).

11

deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[36]

This Court found that Plaintiffs' experts' testimonies and reports supported a finding that CH was objectively deliberately indifferent. In relevant part, Dr. Colley's report stated:

> [A] substantial risk of serious harm was created at the JPCC, that CorrectHealth and JPSO created the risk and/or knew or should have known it existed, and CorrectHealth and JPSO failed to take reasonable steps to abate it. In other words, I find that there is a recklessness or dangerousness to CorrectHealth's suicide risk practices, especially as it applied to Joshua. This is not mere negligence or a simple violation of a standard of care. This is conscious conduct or omission that resulted in the death of Joshua. *While I do not believe it was intentional*, it represents some of the worst suicide risk assessment I have yet to encounter in my career.[37]

This Court agrees with Defendants that Dr. Colley's comment referencing "intentionality," when viewed in isolation, cuts against a finding of objective deliberate indifference. When viewed in context, however, this Court finds that Dr. Colley's conclusions that the risk of harm was obvious and that CH's practices demonstrated "conscious conduct or omission" support a finding of objective deliberate indifference. Overall, this Court finds that Dr. Colley's report helps to create a genuine issue of material fact as to whether CH operated with objective deliberate indifference. Defendants' Motion is denied.

*3. Whether the Court Erred in Finding Causation*

Defendants finally argue that "this Court's decision failed to address the fact that Plaintiffs' expert testimony does not support medical causation which

---

[36] *Rhyne*, 973 F.2d at 392.
[37] Doc. 136-17 at 13 (emphasis added).

is 'necessary in all but simple and routine cases.'"[38] This Court, however, does not find that this standard, adopted by the Southern District of Mississippi from the Mississippi Supreme Court and applied to § 1983 cases for delayed medical care, controls in this case.[39] Rather, Plaintiffs need only demonstrate "a direct causal link between the municipal policy and the constitutional deprivation."[40] Specifically, Plaintiffs must show that a CH policy or custom caused CH employees "to deprive [Belcher] of reasonable medical protection from his own suicidal tendencies."[41] Dr. Colley's report states that "the mental health care that JPCC, via CorrectHealth, provided to Joshua fell well below the standard of care so as to qualify as gross misconduct, egregious behavior, and dangerous, most importantly with regards to suicide risk assessment and management. These *failures directly caused* Joshua's death."[42] This Court thus finds that Plaintiffs have demonstrated a triable issue of fact on the issue of causation.

Defendants argue that a call Belcher received following his time on suicide watch was the sole reason for his suicide and that Belcher was not otherwise suicidal beforehand. This Court again finds that Plaintiffs have presented sufficient evidence to rebut this argument and that the issue was properly deferred to the jury.

---

[38] Doc. 206-1 at 20–21 (citing Graham v. Hodge, 69 F. Supp. 3d 618, 630 (S.D. Miss. 2014), *aff'd*, 619 F. App'x 394 (5th Cir. 2015)).

[39] *See Graham*, 69 F. Supp. 3d at 630 (citing Stuart v. Wexford Health Sources, Inc., No. 3:09cv54, 2012 WL 4101911, at *2 (S.D. Miss. Sept. 17, 2012)); Campbell v. McMillin, 83 F. Supp. 2d 761, 766 (S.D. Miss. 2000) (citing Cole v. Superior Coach Corp., 234 Miss. 287, 106 So.2d 71, 72 (1958)); Perry v. City of Bossier City, No. CV 17-0583, 2019 WL 1782482, at *4 (W.D. La. Apr. 23, 2019) ("Similarly, the Southern District of Mississippi has adopted for § 1983 cases a nearly identical Mississippi Supreme Court holding.").

[40] Anderson v. Dallas Cty. Tex., 286 F. App'x 850, 861 (5th Cir. 2008) (quoting Piotrowski v. City of Houston, 237 F.3d 567, 579 (5th Cir. 2001) (internal quotations omitted)).

[41] *Rhyne*, 973 F.2d at 392 (citing Burns v. City of Galveston, Tex., 905 F.2d 100, 102 (5th Cir. 1990)).

[42] Doc. 136-17 at 13 (emphasis added).

13

Finally, the Court notes that Defendants' Motion only contests this Court's findings as to Plaintiffs' episodic-acts-and-omissions claim. In this Court's Order and Reasons denying Defendants' Motion for Summary Judgment, however, this Court found that Plaintiffs' condition-of-confinement and state law claims also survived summary judgment.[43] Finding that Defendants have not presented sufficient reason for this Court to alter its previous ruling, Plaintiffs' federal and state law claims against Defendants are reserved for trial. Defendants' Motion is denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Alter the Court's Ruling Denying Defendants' Motion for Summary Judgment (Doc. 206) is **DENIED**.

New Orleans, Louisiana this 26th day of February, 2021.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[43] Doc. 197 at 15, 25.